Gunter Johannas BOSEL, Appellant,

v.

STATE of Alaska, Appellee.

No. 32.

Supreme Court of Alaska.

Jan. 30, 1965.

Lester W. Miller, of Kay & Miller, Anchorage, for appellant.

James N. Wanamaker, Dist. Atty., and Dorothy Awes Haaland, Asst Dist. Atty., Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

In January of 1960, Gunter Bosel, defendant below, was tried by jury in the District Court for the Territory of Alaska [1] on two charges of shooting with intent to kill and convicted. It was alleged in the two counts of the indictment that he had shot his two small children in the head with a .32 caliber automatic pistol on Aug-

---

1. The District Court for the Territory of Alaska functioned as a state and federal court for Alaska during the transitional period from territorial status to statehood, specifically, from January 3, 1959, the date on which the President proclaimed Alaska to be a state, until Febru-
ary 20, 1960, when the Superior Court for the State of Alaska went into operation. See Hobbs v. State, 359 P.2d 956, 958–959 (Alaska), cert. denied, 367 U.S. 909, 81 S.Ct. 1923, 6 L.Ed.2d 1250 (1961).

ust 6, 1959. Immediately after the alleged shooting of his children, he shot himself in the head with the same pistol in an attempt at suicide. The scene of the shooting was alongside Sand Lake Road near Anchorage, where the defendant had taken the children in his car and parked. Judgment was pronounced by the court on January 20, 1960, sentencing the defendant to imprisonment for twenty years.

On August 7, 1963, the United States District Court for the District of Kansas granted a writ of habeas corpus to the defendant on the ground that as an indigent he had not been afforded an adequate appellate review of his conviction.[2] Operation of the writ was suspended by the Kansas court pending the present review on appeal which we have granted in forma pauperis.

The defendant presents five questions for review, grounded upon a like number of specifications of error, the first question being whether the trial court erred in refusing to grant defendant's motion for the appointment of a psychiatrist to examine him as to his mental competence to stand trial.

The trial of the case had been set to commence on December 2, 1959, but a week before that date defendant's court-appointed counsel, Neil Mackay, filed a motion for a continuance to enable him "to acquire additional medical information as to defendant's mental capacity, together with the fact of organic and inorganic problems which would be relative to the present competency of the defendant." This was supplemented by another motion filed the day on which the trial was to have commenced, asking the court to order an examination as to the mental competency of the defendant pursuant to title 18 U.S. C.A. § 4244.[3]

At this time we interpolate that after the defendant had been treated for his gunshot wound in Providence Hospital at Anchorage, he was admitted to the military hospital at the Air Force Base adjacent to Anchorage for definitive neurosurgical treatment and on August 14, 1959, transferred to the psychiatric service of the hospital for further evaluation. Here he was observed by Dr. Cheatham, a major in the Air Force and chief of the neuropsychiatric service of the hospital.

In his clinical report of August 21, 1959, the doctor stated that an encephalogram (x-ray of the brain) revealed no evidence of convulsive disorder in the defendant and that studies of certain psychometric and psychological examinations given him confirmed the existence of a severe character disorder but otherwise showed no evidence of any gross intellectual deterioration or of any severe mental disease. The doctor also reported that the defendant had been observed by the clinical staff to have occasional black-out spells but which did not conform with grand mal type of seizures—a pronounced form of epilepsy. The following is the doctor's diagnosis of the defendant made on August 21, 1959:

"Emotional instability reaction, chronic, severe; Manifested by—impulsive, aggressive and destructive acting out behavior, antisocial psychopathic personality traits, fluctuating emotional attitudes, environmental manipulation and pathological lying; Stress—unknown; Predisposition—severe, previous history of detailed psychiatric

2. The defendant directed his petition for the writ of habeas corpus to the federal court in Kansas for the reason that he was serving his Alaska sentence in the federal penitentiary at Leavenworth, Kansas, by contractual arrangment between the United States and the State of Alaska.

3. 63 Stat. 686 (1949). The federal statute is mistakenly referred to in the defendant's motion as "Title 18, Federal Rules of Criminal Procedure, Sec. 42–42."

and neurological evaluations;[4] Impairment—moderate for social and vocational adaptation."

In the "Recommendation" portion of his report the doctor wrote:

"On the basis of the present period of study and evaluation, it is the opinion of the undersigned that *this individual is essentially free of any severe mental disease, defect or derangement.* He does suffer from a very severe character and behavior defect and would generally be classified as an individual possessing a severe psychopathic personality structure. * * * He is regarded as being entirely competent in a legal sense and responsible for his actions and behavior. With respect to the incidents which took place on 6 August 1959 and resulted in the injury of the patient's two children and himself, there is no evidence available to substantiate a claim that he was suffering from the effects of an epileptic seizure at that time or that he was at that time in any way deprived of his mental faculties to the extent that he was unable to distinguish right from wrong or adhere to the right. It is, however, to be anticipated that he will make many claims of being unable to recount the events of the date in question or any awareness of his actions and behavior on the above date in question and also that he will make a concerted effort to convince others that he is suffering from a severe mental or neurological condition." [Emphasis supplied.]

In three affidavits in support of the motions for continuance and for an examination as to the mental competency of the defendant, Mr. Mackay stated that he had had numerous conferences with the defendant but had received from him no assistance in the preparation of a defense. Whether this was due to mental incompetency or the perpetration of a hoax on the part of the defendant, Mr. Mackay did not know. In these affidavits Mackay related that he had tried, but without success, to get a local psychiatric evaluation of the defendant's condition other than the one given by Dr. Cheatham; and that he had, therefore, taken a trip to Seattle and there consulted with two psychiatrists, one of whom said that he would be available to examine the defendant as to both the organic and inorganic status of the disabilities of which he was complaining. In the last paragraph of the second affidavit, Mr. Mackay stated:

"The prime purpose of this affidavit and the motion for continuance is to establish whether the defendant is presently insane, but is primarily to ascertain if there is anything organically wrong with the defendant which would have made him insane at the time the alleged crimes were committed."

The court eventually granted a two weeks' continuance in the trial of the case "to permit defense counsel to consider certain aspects of defense"; but the motion for an examination as to present mental competency was denied. We hold that it was error to deny the motion.

The motion was made pursuant to 18 U.S. C.A. § 4244, which provides, in part, that if one of the parties to a criminal proceeding has reasonable cause to believe that a person charged with an offense against the United States may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of the mental competency of

---

4. Dr. Cheatham in reporting on the past history of the defendant states: "This patient has a very lengthy and detailed past history of psychiatric and neurological difficulties and has previously been examined and treated in many military and Veteran Administration medical facilities. * * * Subsequently, in 1954, he reenlisted in the Army * * * during which time he experienced a recurrence of his 'black-out spells.' He was then given an administrative type discharge from the Army for 'inadaptability.'"

the accused. When such a motion is filed, the court shall cause the accused to be examined as to his mental condition by at least one qualified psychiatrist who has the duty of reporting back to the court. If the report indicates present insanity or the requisite mental incompetency, the court then holds a hearing at which evidence as to the mental condition of the accused may be submitted. The court then makes its findings as to whether the accused is competent to stand trial.

The state points out that the federal statute does not apply in this case because it is made applicable only in the case of persons charged with the commission of offenses against the United States. The defendant here was charged with assault with intent to kill in violation of section 65–4–15, ACLA 1949, which constituted an offense against the Territory of Alaska, not against the United States; so the state is correct in its view.[5] However, it was also the rule at common law, as conceded by the state, that an accused should not be subjected to a criminal trial if he is in such a mental condition that he is unable to understand the proceedings against him or to properly assist in his own defense.[6] Since Alaska had no statute of its own similar to 18 U.S.C.A.

§ 4244 at the time the defendant Bosel was tried,[7] the common law rule prevailed by virtue of sections 2–1–2 and 65–1–3, ACLA 1949.[8]

We have painstakingly searched the record in this case and found therein no indication that any examination or judicial determination was ever made of the defendant's mental competency to stand trial. It is quite evident that the trial judge felt that such an examination was called for under the facts and circumstances of the case, because he discussed the matter from the bench three times prior to trial. On November 30, 1959, he inquired of Mr. Mackay whether he had received the psychiatrist's report that the defendant was competent to stand trial, and on the following day, December 1, he remarked from the bench: "The only thing that concerns the Court at this time is whether or not he [the defendant] is able to aid and assist in his own defense."

On December 2, after Mr. Mackay had served and filed in open court his motion for an examination of the defendant as to present competency, the following discussion ensued:

"THE COURT: Mr. Anderson, what is the background as to this de-

---

5. See Ex parte Krause, 228 F. 547, 549 (W.D.Wash.1915); United States v. Wright, 15 F.R.D. 184, 186 (D.Hawaii 1954).

6. In United States v. Valentino, 283 F.2d 634 (2d Cir. 1960), the court in considering whether 18 U.S.C.A. § 4244, which had not been adopted until 1949, should be applied in the case of the defendant Valentino who had been convicted in 1932 stated at 635:
"True it is that § 4244 was enacted by the Congress many years after the imposition of sentence upon Valentino in 1932. But the provisions of this Section are declaratory of the common law and it is, moreover, too plain for reasonable debate that a prisoner should not be permitted to plead guilty to a criminal charge in a court of the United States if his mental condition was such that he was unable to understand the proceedings before him or properly to assist in his own defense."

7. It was not until April 11, 1960, that our legislature enacted a statute providing for judicial determination of the mental competency of a person charged with the commission of a crime to stand trial. See SLA 1960, ch. 104 [now AS 12.45.-100]. The statute is patterned after 18 U.S.C.A. § 4244.

8. Section 2–1–2 of ACLA 1949 [now AS 01.10.010] provides: "So much of the common law as is applicable and not inconsistent with the Constitution of the United States or with any law passed or to be passed by Congress or the Legislature of Alaska is adopted and declared to be law in the Territory [now State] of Alaska"; and § 65–1–3, ACLA 1949 states "That the Common Law of England as adopted and understood in the United States in regard to criminal matters shall be in force in Alaska except as modified by statutory law of the Territory."

fendant? Has he been examined by a psychiatrist?

"MR. ANDERSON [the prosecutor]: Yes, he has been examined by Dr. Cheatham.

"THE COURT: Was there a report filed in this case?

. * * .* *. * *

"MR. ANDERSON: Not to my knowledge, your Honor.

"THE COURT: Do you intend to call Dr. Cheatham?

"MR. ANDERSON: I will if it is necessary.

"THE COURT: I think it should be. You should have in this file a report of Dr. Cheatham. Did he ever reduce it to writing?

"MR. ANDERSON: I have a report submitted to me by Dr. Cheatham concerning Mr. Bosel.

"THE COURT [To one Mr. LaBate who had just joined court and counsel at the bench]: * * *. Now, at this point, Mr. Mackay has filed a motion for examination as to the defendant's mental competency, and I have just asked Mr. Anderson whether or not he's been examined. When I say 'he,' the defendant, Mr. Anderson informs me that Dr. Cheatham has examined him, and I don't have a copy of the report but Mr. Anderson informs me and Mr. MacKay indicated in court that Dr. Cheatham had determined that the defendant was competent to stand trial, could aid and assist in his defense, is that not true, Mr. Mackay?

"MR. MACKAY: That is my understanding from Mr.———"

Whatever gave the prosecutor and the trial judge the impression that Dr. Cheatham determined in his report that the defendant was presently competent to stand

trial we do no know. Suffice it to say, that the report is devoid of any such determination. The "diagnosis" and "recommendation" contained in the report, as quoted verbatim earlier in this opinion, make no mention of present competency to stand trial.

The doctor did state in the "recommendation" portion of his report that the defendant "is regarded as being entirely competent in a legal sense and responsible for his actions and behavior"; but the statement appears to relate only to the defendant's mental condition on August 6, 1959, and it is certainly not equivalent to a pronouncement that the defendant was found to be in such a mental condition that he was able to understand the proceedings against him and properly assist in his own defense. . .

The question of whether an investigation should be made to determine the present sanity or mental competence of a person accused of a crime to stand trial is generally held to be addressed to the sound discretion of the trial court.[9] In other words, the trial court may exercise its discretion in deciding whether such a doubt exists with respect to present sanity or mental competence as would require an examination of the defendant by a qualified psychiatrist. Before an examination can be justified the doubt in the mind of the judge must be real[10] and he will not be reversed unless he abused his discretion in the matter.[11] The trial judge must have entertained such a real doubt in this case or, we feel certain, he would not have gone the length he did to assure himself, by questioning counsel, that the defendant had been examined by a psychiatrist, and that the psychiatrist had made a report indicating that the defendant was able to aid and assist in his own defense.

At the trial Dr. Cheatham was used as a witness by both the defendant and the state and testified extensively regarding the examination and tests given the defendant

9. State v. Smith, 173 Kan. 813, 252 P.2d 922 (1953); Annot., 142 A.L.R. 961, 966–971 (1943).

10. State v. Smith, supra note 9.

11. State v. Smith, supra note 9; State v. Kitchens, 129 Mont. 331, 286 P.2d 1079, 1083 (1955); State v. Stone, 111 Or. 227, 226 P. 430 (1924); Annot., 142 A.L.R. 961, 971–972 (1943).

during the week commencing August 14, 1959, and again on January 6, 1960—five days before the commencement of the trial. He reaffirmed the diagnosis and conclusions contained in his report of August 21, 1959, and stated that he had no cause to change the report because of any later information obtained by him, except for an additional "opinion that Mr. Bosel might be further diagnoses as a case of Munchausen's syndrome." [12]

The doctor testified that he found no evidence that the defendant was suffering from psychomotor epilepsy or any kind of convulsive disorder or epileptic condition or from any mental disease or derangement. It was his opinion that the defendant suffered from no mental defects or derangements or physical condition which would have impaired his ability on August 6, 1959, to distinguish right from wrong or to adhere to the right; that the defendant was a pathological liar; and that the defendant possessed a definite defect in his character and behavior and in his personality structure, best defined as a disturbance in his moral, not mental, faculties.

This testimony of Dr. Cheatham at the trial was all very well and good as tending to show that the defendant was sane and mentally competent on August 6, 1959, but it fails, just as did the doctor's report of August 21, to answer the crucial question in the mind of the trial judge as to whether the defendant was able to aid and assist in his own defense.

■ The test is not whether or not the defendant Bosel is legally sane, whether he can distinguish right from wrong, but rather, whether he is presently insane *or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense*[13]

■ We conclude that the verdict and judgment against the defendant must be set aside and the case remanded to the superior court. In view of the difficulty of retrospectively determining the defendant's competency to stand trial five years ago, the superior court is directed to conduct a new investigation as to the defendant's present competency to stand trial and to hold a new trial if the petitioner is found competent.

There are four other errors specified by the defendant on this appeal but we need not rule upon them since they are of such a nature that they will not occur again in the event of a new trial.

Reversed and remanded.

12. Dr. Cheatham described Munchausen's syndrome as a condition pertaining to individuals who possess disturbances in character and behavior and in their personality structure and who make a practice of frequently requesting admissions to hospitals and for medical care and treatment for which there is no apparent organic basis. These persons usually enter hospitals complaining of such things as dizziness, faintness, frequent headaches, convulsions, epileptic states, periods of depersonalization and feelings of unreality. They are universally uncooperative, demanding, and extremely dramatic in the presentation of their symptoms for the purpose of gaining sympathy.

13. Dusky v. United States, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960), in which the Supreme Court agreed with the Solicitor General that the "test must be whether he [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him"; United States v. Valentino, 283 F.2d 634 (2d Cir. 1960); Marshall v. Territory, 2 Okl.Cr. 136, 101 P. 139, 142–143 (1909). See United States v. Westerhausen, 283 F.2d 844, 852 (7th Cir. 1960).