Charles S. SCHADE, Appellant,

v.

STATE of Alaska, Appellee.

No. 1620.

Supreme Court of Alaska.

July 27, 1973.

R. Collin Middleton, Deputy Public Defender, Herbert D. Soll, Public Defender, Anchorage, for appellant.

Stephen G. Dunning, Asst. Dist. Atty., Seaborn J. Buckalew, Jr., Dist. Atty., Anchorage, John E. Havelock, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

## OPINION

CONNOR, Justice.

Charles S. Schade was convicted of first degree murder, after trial by jury. His appeal concerns not only the defense of insanity but certain other issues necessarily connected with that defense.

At about 5:00 p. m. on November 3, 1970, Nancy Miller left her work at a drive-in restaurant in Kodiak, Alaska. She was on foot. She was reported as missing the next day. By the morning of November 5th her nude body was found near a road. The body had been stabbed eight times. One of the thrusts was directly to the heart, which killed her.

In the ensuing investigation, the Navy criminal investigators at the nearby Kodiak Naval Station were asked to provide assistance. Special agents Barker and Kennedy learned that a hospital corpsman, Blevins, had treated a marine corporal, Charles Schade, for a head injury on the night Nancy Miller was last seen. Blevins was dubious about Schade's story to the effect that he had been clubbed by an unknown man as he left the bowling alley on the naval base. Agent Kennedy called the Kodiak Police Department and related his information. The Kodiak police officials indicated that they would like to interview Schade. Agent Barker then called Major Mason, Schade's commanding officer, and asked whether Schade could be released from duty for an interview. Major Mason telephoned Schade and asked whether he objected to an interview. Schade indicated his assent.

Barker and Kennedy met Schade on the base, asked him again whether he was willing to be interviewed, and obtained his assent. The agents accompanied Schade to the Kodiak police station, arriving there at about 5:30 p. m. on November 6th. Lt. Henderson asked Schade to come into his office, where he sat on one side of the desk and Schade on the other. Henderson advised Schade of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The adequacy of the warning is one of the issues in this appeal. Henderson obtained a written waiver from Schade, consenting to be interviewed.

During the interrogation Schade told a series of stories, each one progressively more incriminating than the earlier versions. He finally stated that on the evening of November 3rd he had grabbed a girl on the road in Kodiak and had pulled her off the road. Henderson asked several questions to which he was sure only the killer would know the answers. The answers conformed to Henderson's information. The interrogation was suspended about 9:15 p. m., with Schade agreeing to give a written statement.

At about 10:00 p. m. Schade finished the statement. It was entirely in his handwriting, except for some questions and answers written in by Henderson, with Schade's signature following. At this time Henderson formally arrested Schade.

The written statement was highly incriminating. In it, Schade admitted pulling the girl off the road, and said that he "might have" unclothed her, after which he was struck,

> "by some unknown substance, up against the head by her [sic]. After which I believe I may have been holding some foreign substance and struck her once or twice—after which she fell and rolled and didn't move. . . ."

Lt. Henderson talked briefly with the Kodiak police chief; then he reminded Schade of the rights he had been advised about earlier and continued the interrogation. Schade admitted that he had lied about the weapon in his first written statement, and now corrected his story to identify both the weapon and the place where he had disposed of it. As before, he agreed to furnish a written statement. The body of it is entirely in his handwriting. It reads:

> "I early [sic] gave Lt. Henderson bum scoop in the form of a statement on location and weapon and so do wish to change now.

Location: Harbor, behind Harbor master building and off to Left.

Weapon: small fishing knife approx. 6″ long, steel with scaling blade on top and pointed and simi-sharp [sic] cutting blade. Black tape holding handle together."

Schade later showed Henderson where he had thrown the knife. It was recovered by a diver. It matched Schade's description except that it was eight inches in length.

After Schade was indicted, the trial court determined that he was competent to stand trial.

At trial the prosecution put on proof of Schade's confessions, circumstantial evidence linking Schade to the commission of the offense, and items of proof about Schade's demeanor both before and after the commission of the offense. The defense put on evidence that Schade was suffering from a major mental illness, paranoid schizophrenia, at the time the offense was committed. The psychiatric evidence and its interpretation was, however, disputed vigorously by the prosecution.

The jury found Schade guilty of first degree murder. He was sentenced to life imprisonment.

The contentions on appeal are:

(1) It was reversible error not to apply the insanity test of Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954).

(2) It was reversible error to apply the insanity test of M'Naghten's Case, 10 Cl. & Fin. 200, 8 Eng.Rep. 718 (H.L. 1843).

(3) Appellant was not competent to stand trial.

(4) Appellant's confession was inadmissible because he was not given a proper warning as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(5) Appellant's confession was inadmissible because, as a result of his mental disorder, the confession was involuntary.

(6) Appellant's confession was inadmissible because it was obtained during, and was the product of, unlawful detention.

(7) The court erred in failing to accept appellant's waiver of a jury trial.

(8) It was error not to instruct the jury on the effects of a verdict of not guilty by reason of insanity.

(9) It was error to allow a particular psychiatrist, one Dr. Rollins, to testify.

The Court has had the benefit of ample and clearly presented arguments and briefs from both parties to this appeal.

## I. THE INSANITY TEST

Appellant objected to the use of an instruction to the jury which employed an insanity test similar to that set forth in Chase v. State, 369 P.2d 997 (Alaska 1962).[1] In the case at bar the instruction used by the court was different from the one approved in *Chase,* but it was in substance a statement of the rule derived from M'Naghten's Case, 10 Cl. & Fin. 200, 8 Eng.Rep. 718 (H.L.1843). It read:

"Mental illness and mental abnormality, in whatever form either may appear, are not necessarily the same as legal insanity. A person may be mentally ill or mentally abnormal and yet not be legally insane. For mental illness or mental abnormality to be a defense to crime, such

1. *Chase* set forth a version of what the court believed to be the historic M'Naghten Rule governing insanity as a defense to a criminal charge. The instruction approved in *Chase* read in relevant part as follows:

"Insanity, as the word is used in these instructions, means such a diseased and deranged condition of the mental facilities of a person as to render him incapable of knowing the nature and quality of his act and of distinguishing between right and wrong in relation to the act with which he is charged."

For a full discussion, see Pope v. State, 478 P.2d 801 (Alaska 1970) (dissenting opinion).

condition must make the person incapable of knowing or understanding the nature and quality of his act, or make him incapable of knowing or understanding that his act was wrong."

The last occasion on which the proper test of insanity as a defense to crime was at issue in this Court was in Pope v. State, 478 P.2d 801 (Alaska 1970). A majority of the Court did not reach the ultimate question of whether *Chase* should be overruled and whether a different test than the one formulated in *Chase* should be employed. My separate opinion in *Pope* did deal with the insanity formulation and urged that the test in Alaska be patterned on that developed by the American Law Institute.[2] Since the publication of *Pope*, and since the judgment entered in this case, the legislature has acted in the field. In 1972, it enacted the following statute which provides in part:

"*Mental disease or defect excluding responsibility.* (a) A person is not responsible for criminal conduct if at the time of the conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

(b) Reliance on mental disease or defect as excluding responsibility is an affirmative defense. The burden of proof beyond a reasonable doubt does not require the prosecution to disprove an affirmative defense unless and until there is evidence supporting the defense. The requirement of evidence supporting the affirmative defense is not satisfied solely by evidence of an abnormality which is manifested only by repeated criminal or otherwise antisocial conduct." AS 12.-

45.083(a), (b), as enacted by Ch. 119 SLA 1972.

That is the test which must be used after September 10, 1972, the effective date of the statute.

The case at bar, and certain companion cases, were tried before the statute came into effect. The question before us is what test should have been used in those cases tried before the current statute became law, and as to which a direct appeal has been taken on the proper test of insanity as a defense to a criminal charge.

As pointed out in the separate opinion in *Pope*, 478 P.2d at 810, the test employed in *M'Naghten's Case* contains many defects and has been subjected to severe critical attack, especially during the last two decades. One of the main difficulties with the *M'Naghten* rule is that it assumes that mental illness is a mere failure of intellectual function, while modern psychiatry takes into account the affective aspects of human personality in diagnosing and analyzing the nature of mental and emotional illnesses. For this reason, the use of the *M'Naghten* test deprives the trier of fact of many of the insights yielded by modern psychiatry.[3]

There is widespread agreement today that in a modern age the *M'Naghten* rule works an injustice, as many types of serious mental illness do not relieve a defendant of culpability under that rule even though he may lack substantial capacity to understand the wrongfulness of his conduct or conform his conduct to the law. Pope v. State, 478 P.2d at 809, n. 10.

During the last ten years the American Law Institute test and others patterned after it have gained widespread acceptance.[4] Chief Judge Haynsworth comment-

2. That test is:
   "(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.
   (2) The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." ALI Mod.P.Code, § 4.01 (final draft) (1962).

3. P. Roche, The Criminal Mind (1957), 168–195, 244–274.

4. The current Alaska statutory test differs in only one minor particular from the Model Penal Code formulation: the latter test excludes from the term "mental dis-

ed on the desirability of the A.L.I. test in United States v. Chandler, 393 F.2d 920, 926 (4th Cir. 1968) (en banc):

> "With appropriate balance between cognition and volition, it demands an unrestricted inquiry into the whole personality of a defendant who surmounts the threshold question of doubt of his responsibility. Its verbiage is understandable by psychiatrists; it imposes no limitation upon their testimony, and yet, to a substantial extent, it avoids a diagnostic approach and leaves the jury free to make its findings in terms of a standard which society prescribes and juries may apply." (footnotes omitted).

We are persuaded that the *M'Naghten* test is no longer acceptable. The test currently found in AS 12.45.083 (which encapsulates the American Law Institute formulation) is, in our opinion, the correct one. It should have been employed in this case.

It follows that, regardless of the disposition of the other issues in this case, a reversal and a new trial will be necessary. It also follows that the test adopted in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), urged upon us by appellant, is rejected.[5]

Mr. Justice Erwin's dissenting opinion expresses the belief that because the legislature has acted to change the applicable law we should not change the rule of Chase v. State in deciding the case before us. This, it is said, would make the new statute retrospective in operation. We think this misses the central point of the matter. Throughout these proceedings ap-

pellant has claimed that the rule of Chase v. State was, as a judicially created rule, erroneous. We agree with appellant's contentions. We have determined, as have many other courts,[6] that the proper judicially created rule should have been that expressed in AS 12.45.083.

## II. COMPETENCY TO STAND TRIAL

Pursuant to motion, a pre-trial determination of appellant's competency to stand trial was made in this case.[7] Appellant contends that the trial court erred in determining that he was competent to stand trial. Because the same issue may be urged in the further proceedings after remand of this case, we shall express our opinion, at least upon the record as it now stands.

On this question the court had before it reports from two psychiatrists, Dr. Joseph D. Bloom and Dr. William J. Rader.[8] Part of Dr. Bloom's report stated:

> "Therefore, the number one conclusion of this examination is that at the present time Mr. Schade is clinically psychotic and is suffering from a paranoid schizophrenic reaction. It is the opinion of this observer that Mr. Schade, however, does understand the nature of the charges against him and the object of the proceedings against him. As was stated in court, I think he will be able to aid his counsel on a variable basis, depending upon the idiosyncrasies of his own thinking process. As we stated at the competency hearing, it is the opinion of this observer that his defense counsel will be able to determine whether his client is or

---

ease or defect" an abnormality manifested only by repeated criminal or antisocial conduct, but the Alaska statute says that the burden of proof of insanity as an affirmative defense is not satisfied solely by evidence of such abnormality.

5. Under Durham one is held not responsible "if his unlawful act was the product of mental disease or mental defect." 214 F.2d at 874.

6. The cases are collected in Pope v. State, 478 P.2d at 811, n. 21.

7. Under AS 12.45.087(c)(3), the examining psychiatrist must render a report including, "if the defendant suffers from a mental disease or defect, an opinion as to his capacity to understand the proceedings against him and to assist in his own defense . . . ."

8. The report of a third psychiatrist, Dr. Rollins, was not considered by the court at this stage of the proceedings.

is not cooperating with him and can make this known to the court when indicated."

Dr. Rader's report concluded as follows:

"It is my opinion that the defendant understands the nature of the charge against him and the object of the proceedings against him. Concerning his capacity to aid in his defense, it is this examiner's opinion that he does have the ability to aid in his defense. Whether or not he will choose to do so is a different matter. Whether in any case in which a person who is known to be psychotic will choose to cooperate in his defense can not be predicted with certainty. The fact is that no guarantees can be forthcoming and the most that can be established is whether or not he has ability to do so. I believe that he does have that ability."

The court also had the benefit of a statement made by Schade's own counsel. At the time of the competency determination defense counsel stated:

"Both Dr. Rader and Dr. Bloom have examined Mr. Schade, they found him to be, you know, competent to stand trial. I've spoken with Charles Schade for some fair amount of time and I feel that he can aid me in his own defense, and I would ask that the court consider that statement also and make such findings as they—as the court would wish on it."

At that point the court engaged in the following colloquy with Mr. Schade:

"THE COURT: Mr. Schade, have you hear—you heard your attorney indicate he's willing to accept the report of Dr. Rader who—which indicates that you are competent for the court

to consider in making a finding as to whether you are competent or not. Are you willing to or do you want us to hear Dr. Rader's testimony?

MR. SCHADE: I'll go by my lawyer's opinion."

■ Appellant's counsel on appeal argues that Schade was not in fact competent to stand trial, that this question can be raised for the first time on appeal, and that the conviction of one who is legally incompetent violates due process of law. In support of this argument, resort is had to certain testimony given by Dr. Bloom at the trial of this case which was:

" . . . one of the defenses that a psychotic individual can—can effectively use is denial of reality and in my contacts with—especially my last contact with Mr. Schade which occurred several weeks ago I think he had by that time successfully, to himself denied the events of this evening."

We accept appellant's argument that trial counsel's statement to the court that he thought Schade competent is only of evidentiary value, and is not dispositive of the question. Hansford v. United States, 124 U.S.App.D.C. 387, 365 F.2d 920, 924, n. 11 (1966). We also accept the proposition, urged by appellant, that Pate v. Robinson, 383 U.S. 375, 385, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), holds that the conviction of a person who is incompetent to stand trial violates due process of law.[9] But in *Pate* there had been no inquiry or hearing on the question by the trial court, as contrasted with the case at bar.

One of the primary reasons for requiring that a defendant be competent before standing trial is to safeguard the accuracy

---

9. Indeed, the rule at common law was that "an accused should not be subjected to a criminal trial if he is in such a mental condition that he is unable to understand the proceedings against him or to properly assist in his own defense." Bosel v. State, 398 P.2d 651, 654 (Alaska 1965). We note in passing that AS 12.45.100, as amended in 1972, appears to codify the common law rule as articu-

lated in *Bosel*. It provides, *inter alia*, that:

"No person who as a result of mental disease or defect lacks capacity to understand the proceedings against him or to assist in his own defense may be tried, convicted or sentenced for the commission of an offense so long as the incapacity endures."

**914**

of the guilt finding process. Note, Incompetency to Stand Trial, 81 Harv.L.Rev. 454, 457 (1967). The defendant must have some minimum ability to provide his counsel with information necessary or relevant to his defense. He must also be able to understand the nature of the proceedings sufficiently to participate in certain decisions about the conduct of the defense. Some strategic choices must be the product of meaningful communication between the defendant and his counsel.

But this does not mean that a defendant must possess any high degree of legal sophistication or intellectual prowess. In determining competency, the standard of judgment must be a relative one. Some comparison must be made between the apparent competency of the accused and the ability level of the average criminal defendant. That level of ability is often not great. Numerous persons are subjected to criminal prosecution, and properly so, even though they are of relatively low intelligence or are suffering from some significant emotional or physical impairment. Not every emotional flaw renders one incompetent to stand trial.[10]

■ The presence of some degree of mental illness is not an invariable barrier to prosecution. There may be an impaired functioning of some aspects of the defendant's personality and yet he may still be minimally able to aid in his defense and to understand the nature of the proceedings against him. Wilson v. United States, 129 U.S.App.D.C. 107, 391 F.2d 460, 463 (1968); Smith v. United States, 267 F.2d 210, 211 (9th Cir. 1959). A precise formula for weighing these matters is not possible to achieve. To a large extent each case must be considered on its particular facts, and

must call for the application of judicial discretion.

■ Where, as here, the psychiatric examination of the defendant yields professional findings that the defendant is competent to stand trial, the question of whether to hold any further or evidentiary hearings is addressed to the sound discretion of the trial court. Accord, United States v. Kaufman, 393 F.2d 172, 176 (7th Cir. 1968), cert. denied 393 U.S. 1098, 89 S.Ct. 892, 21 L.Ed.2d 789 (1969); Cheely v. United States, 367 F.2d 547, 549 (5th Cir. 1966). Nothing in the record of the case at bar suggests a need for a more extensive inquiry into defendant's competence. It was not error for the trial court to find Schade competent to stand trial.[11]

### III. ADMISSIBILITY OF THE CONFESSIONS

■ Appellant contends that his confessions were obtained without adequate prior warnings of his constitutional rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Under that case statements of the accused, stemming from custodial interrogation, are not admissible in evidence unless a proper warning has been given before interrogation has commenced. The warning must clearly apprise the accused (1) that he has the right to remain silent, (2) that any statements he makes may be used against him, (3) that he has the right to consult with a lawyer and to have the lawyer with him during interrogation, and (4) that if he is indigent he is entitled to have a lawyer appointed for him prior to any interrogation.

Here, before interrogation commenced at the Kodiak police station, Lt. Henderson

---

10. Similarly, one who was severely intoxicated at the time an offense was committed may have little or no memory of the event, and may have failed to gather evidence which might be helpful to his defense. Yet he is normally considered competent to stand trial.                    .

11. Appellant argues by analogy from certain cases concerning defendants suffering from amnesia, caused other than by mental illness. *Compare* State v. McClendon, 103 Ariz. 105, 437 P.2d 421, 425 (1968). Not only are those situations distinguishable, but we would be indulging in unnecessary *obiter dicta* by delving into that subject at this time.

orally advised Schade of his rights and obtained a signed waiver based upon the following written statement of rights, which Schade had read:

## "DEPARTMENT OF POLICE KODIAK, ALASKA

### YOUR RIGHTS

Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. *We have no way of giving you a lawyer, but one will by appointed for you, if you wish, if and when you go to court.* If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer." (Emphasis added).

Appellant asserts that the emphasized portion of the warning was contradictory and confusing, thus rendering the warning constitutionally inadequate. The case most closely supporting appellant's argument is Gilpin v. United States, 415 F.2d 638, 639 (5th Cir. 1969). There the warning was as follows:

"Before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in a court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. We have no way of giving

you a lawyer, but one will be appointed for you, if you wish, if you go to court. If you want to answer questions now, you can do so but you can stop answering at any time."

The court held that warning to be defective because it did not bring home to the accused his right to the presence of counsel *during interrogation.* This, coupled with the reference to the appointment of counsel at some future time, upon going to court, might mislead the accused into believing that he had no right to the presence of appointed counsel during the interrogation process. [12]

We find Mayzak v. United States, 402 F.2d 152 (5th Cir. 1968), to be more closely in point and more persuasive. There, after an F.B.I. agent had given a suspect the standard *Miranda* warnings, he added a statement that the F.B.I. could not furnish counsel until federal charges had been brought against the suspect. The warnings were sustained on appeal, with the following comment:

"Stripped of its cry of pain, defendant's contention is simply that he was entitled to be warned not only of his right to counsel, but of his right to instant counsel. *Miranda* however, does not require that attorneys be producible on call, or that a Miranda warning include a time table for an attorney's arrival. Nor does it seem to us requisite that the officer conducting the interview declare his personal and immediate power to summon an attorney. The adequacy of the warning is not jeopardized by the absence of such embellishments." 402 F.2d at 155.

There is always a risk that by adding language to that required by *Miranda* the warning may be rendered contradictory or confusing. But the additional language

---

12. Appellant cites a number of cases which are distinguishable from the case at bar. Many of them concern warnings which failed to mention the right to have an attorney present during interrogation, or the right to the appointment of an attorney, or both: United States v. Garcia, 431 F.2d 134 (9th Cir. 1970); Smith v.

Rhay, 419 F.2d 160 (9th Cir. 1969); Lathers v. United States, 396 F.2d 524 (5th Cir. 1968); Groshart v. United States, 392 F.2d 172 (9th Cir. 1968); Windsor v. United States, 389 F.2d 530 (5th Cir. 1968); United States v. Berard, 281 F.Supp. 328 (D.Mass.1968).

employed in the case before us did not, in our opinion, dilute the meaning of the rights set forth in the balance of the warning. By telling Schade that the police had no way of giving Schade a lawyer, the warning was merely an expression of the truth. We hold that the warnings were constitutionally adequate. As to this point it was not error to admit the confessions.[13]

Appellant's next claim is that his mental illness rendered the confessions involuntary, and hence inadmissible. At a hearing on the motion to suppress the confessions, Dr. Bloom was called as a witness for both the prosecution and the defense. Dr. Bloom's diagnosis was that Schade suffered from a schizophrenic reaction, chronic paranoid type, and that this condition existed at the time of both the homicide and the confessions. In his opinion, the confessions were partly an emanation of the grandiosity of Schade's paranoid thought processes: that by confessing to some of the implicating facts, but couching the confessions in subjunctive terms, he might be able to "outsmart" the authorities and render the confessions invalid. Appellant also notes that Lt. Henderson thought Schade's conduct strange in that he displayed no remorse about the killing in the process of confessing, and seemed quite calm and friendly during that time.

However, on examination by the prosecutor, Dr. Bloom conceded that Schade was capable of understanding his rights as explained to him in the *Miranda* warning, and that he understood the written confession he provided to the police. In answer to a question by appellant's counsel, Dr. Bloom stated that he could not say that Schade's confessions were the product of a paranoid type of grandiosity. They were a product of both his intact functioning and his illness, although it would be impossible, in any quantitative sense, to state the degree to which either the rational or irrational thought processes were operative at the time he confessed.

The court also had before it the testimony of lay witnesses which bore upon Schade's demeanor at points in time important to determining voluntariness of the confessions. The hospital corpsman who treated Schade's head injury recalled that Schade was responsive to his questions and did not seem to be under any real distress. The agents who accompanied Schade from the naval station to the Kodiak police station recalled that Schade seemed coherent and calm, and that he made small talk during the journey.

The written confessions themselves bear certain earmarks of voluntariness. While the psychiatrist regarded them partly as manifestations of Schade's paranoid schizophrenia, it is also possible to read them as factual statements by one sufficiently in contact with reality to recall and relate the essential details of the offense. The answer to one of Lt. Henderson's questions is significant in this regard:

"Q. Do you have anything else you wish to add to this statement?

A. No, I really don't know why I did this crime."

Confessions are not admissible unless they are voluntary. Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968); Clewis v. Texas, 386 U.S. 707, 708, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); Fikes v. Alabama, 352 U.S. 191, 197, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957). In determining voluntariness we must look to the totality of the circumstances surrounding the confession.

Mental illness is not an invariable bar to the admissibility of a confession. It is only one of several factors which must be weighed in determining whether the confession was the product of a free will or was the product of an irrational mind or one which was overborne by coercion. McAffee v. United States, 72 U.S.App.D. C. 60, 111 F.2d 199 (1940), cert. denied 310 U.S. 643, 60 S.Ct. 1094, 84 L.Ed. 1410

---

13. *Accord,* Klingler v. United States, 409 F.2d 299, 308 (8th Cir. 1969); Coyote v. United States, 380 F.2d 305, 308–309 (10th Cir. 1967).

(1940); Criswell v. State, 86 Nev. 573, 472 P.2d 342, 343 (1970); State v. Ortiz, 77 N.M. 316, 422 P.2d 355, 357 (1967); People v. DeSimone, 67 Ill.App.2d 249, 214 N.E.2d 305, 309 (1966); Andrews v. Hand, 190 Kan. 109, 372 P.2d 499, 565 (1962), cert. denied 371 U.S. 880, 83 S.Ct. 152, 9 L.Ed.2d 117 (1962).

■ In the case of Schade it is true that by one interpretation of the evidence it can be argued that his confessions were the product of a mental illness and not the exercise of a free will. But it is also a permissible inference from the evidence that the confessions were those of one who was basically rational and was not operating under coercive forces, even though he was suffering an emotional disease process, of disputable severity.[14] It must be kept in mind that the prosecution did not concede at any time that Schade was lacking in mental responsibility for the criminal act, or that he was incapable of making a voluntary confession.

Different inferences can be drawn from various items of evidence that were before the court on the question of the confessions' voluntariness. But our review of the record convinces us that there was sufficient evidence to support the determination, by a preponderance of the evidence, that the confessions were voluntary and, therefore, admissible. It was not error to allow the confessions into evidence at the trial.

The next contention is that Schade's confessions were obtained during, and were the product of, unlawful police detention. We find it unnecessary to consider the question of whether Schade was being detained during his interview at the Kodiak police station. Even if it is conceded arguendo that Schade was under arrest during this period of time, our holding as to the adequacy of the *Miranda* warnings is dispositive. For even if the questioning of Schade amounted to custodial interrogation, we have deemed the *Miranda* warnings adequate. It is not argued that any events which took place at the Kodiak police station amounted to an unlawful coercion in themselves. Accordingly we find no error as to this point.

## IV. OTHER QUESTIONS

Appellant asserts error in the refusal of the trial court to accept his waiver of a jury trial. Because we are reversing and remanding this case for a new trial, the provisions of a new statute will govern. The law now provides:

"When a person offers a defense based on mental disease or defect excluding responsibility for his criminal conduct, he may waive a jury trial without the consent of the state." AS 12.45.083(d).

On remand this statute will be controlling. It is not necessary, therefore, for us to consider further the question of waiving jury trial without the consent of the state prior to the enactment of this statute.

■ The next point on appeal concerns a requested jury instruction on the effects of a verdict of not guilty by reason of insanity. Appellant requested and was denied the following instruction, which is substantially in the language of AS 12:45.-090:[15]

"You are further instructed that if the jury finds the defendant not guilty on

---

14. The difficulty presented in cases of paranoid personality types is that they may exhibit many signs of rationality and sound ego function. It may be only as to certain areas of mentation that persecutory or grandoise ideas become unrealistic and overwhelm normal controls. Where, as here, there is scanty evidence of delusions or hallucinations at any particular time, or of a complete psychotic break with reality, it becomes difficult to ascribe the confession to mental illness.

15. AS 12.45.090:
"If the jury finds the defendant not guilty on the ground of mental disease or defect and the court considers his being at large dangerous to the public peace or safety, the court shall order him to be committed to an institution authorized by the commissioner of health and social services to receive that person, and held in custody until the disease is cured or the defect corrected or he is otherwise discharged from the institution by authority of law."

the ground of insanity and the court considers his being at large as dangerous to the public peace or safety the court shall order him to be committed to an institution authorized by the Commissioner of Health and Welfare to receive that person, and held in custody until he becomes sane or is otherwise discharged therefrom by authority of law."

The main arguments against giving such an instruction are that the jury should not speculate about punishment, that the jurors probably know that hospitalization will result from a verdict of not guilty by reason of insanity, and that such an instruction diverts the jury's attention from the real merits of the case. State v. Garrett, 391 S.W.2d 235, 240–242 (Mo.1965); State v. Hood, 123 Vt. 273, 187 A.2d 499, 501 (1963). In a majority of jurisdictions such an instruction is not given. Annot., 11 A.L.R.3d 737 (1963).

Other courts have found the instruction both necessary and desirable. Lyles v. United States, 103 U.S.App.D.C. 22, 254 F.2d 725 (1957), cert. denied 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958), holds that such an instruction ought to be given whenever it is requested by the defendant. Speaking for a majority, Judges Prettyman and (now Chief Justice) Burger said:

"The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity. Jurors, in common with people in general, are aware of the meanings of verdicts of guilty or not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning. . . . It means the accused will be confined in a hospital for the mentally ill until the superintendent of such hospital certifies, and the court

is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others. We think the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts." 254 F.2d, at 728.

Studies on juroral behavior indicate that as a practical matter juries, in their deliberations, do tend to concern themselves with the consequences of the insanity verdict. H. Weihofen, Procedure for Determining Defendant's Mental Condition Under the American Law Institute's Model Penal Code, 29 Temp.L.Q. 235, 247 (1956).

In People v. Cole, 382 Mich. 695, 172 N.W.2d 354, 356 (1969), the Michigan Supreme Court considered this problem. It viewed it as a judicial choice between (1) a possible miscarriage of justice flowing from the imprisonment of one who should be hospitalized, because the jury does not understand the effects of its insanity verdict, and (2) a possible invitation to the jury to consider matters extraneous to the merits in rendering a verdict. The Court concluded that the reasons supporting the special instruction outweighed the dangers of giving it.

We are similarly persuaded. We hold, therefore, that an instruction of the type requested in this case should be given whenever it is requested by the defendant. It follows that at any new trial of this case upon remand the instruction should be given.

The final point raised in this appeal challenges the trial court's ruling allowing one Dr. John P. Rollins to testify concerning Schade's competence to stand trial. An initial pretrial hearing was had before Judge Davis to determine Schade's competence. Dr. Bloom was the only witness to testify. Following this hearing, the State requested further examination by another psychiatrist. Defense counsel did not object to any further examination, but did request that the examining psychiatrist be

someone other than Dr. Rollins. Accordingly, Judge Davis indicated that he would sign an order directing Dr. Koutsky of the Alaska Psychiatric Institute, or his designee—excluding Dr. Rollins—to make the examination.

Dr. Koutsky was unable to perform the examination. Dr. Rollins, apparently on his own motion, examined Schade and submitted a report.[16] At the second competency hearing, upon defense objection, Judge Occhipinti refused to let Dr. Rollins testify. The court ordered yet another examination to determine Schade's competence, this to be conducted by Dr. Rader.

At trial, over strenuous defense objection, the state was allowed to use Dr. Rollins as an expert witness in rebuttal. The defense objected that to permit Dr. Rollins to testify would violate the physician-patient privilege and would breach the privilege against self-incrimination.

■ We are not persuaded that either objection is well taken. Rule 43(h)(4) of the Alaska Rules of Civil Procedure [17] provides that a physician or surgeon

"shall not, against the objection of his patient, be examined in a civil action or proceeding as to any information acquired in attending the patient which was necessary to enable him to prescribe or act for the patient."

That rule by its terms applies only in civil proceedings. Alaska Criminal Rule 26(b) enumerates the evidentiary privileges of an accused. The physician-patient privilege is not listed therein. Additionally, the relationship of patient and treating physician was not present between Schade and Dr. Rollins. The doctor's inquiry was for the purpose of rendering an opinion on competency to stand trial, not to prescribe or act for Schade.

■ Turning to appellant's Fifth Amendment objection, we agree that under some circumstances a psychiatrist's testimony at trial as to statements made by a defendant during a psychiatric interview may violate that defendant's privilege against self-incrimination. For example, where a defendant has injected no psychiatric issue into the case, an order compelling him to submit to examination, including discussion of the alleged criminal event, would violate his Fifth Amendment privilege against self-incrimination.[18]

In the matter before us, by contrast, Schade's insanity defense was the key issue in the case. Dr. Burke and Dr. Bloom had both previously testified as to Schade's mental condition before Dr. Rollins took the stand. Furthermore, the record indicates that Dr. Rollins neither questioned Schade concerning the death of Nancy Miller nor testified as to any statement that Schade might have volunteered on the subject. Rather, Dr. Rollins' knowledge of the crucial event was based on the police reports. His testimony was confined to the insanity defense raised as an issue by Schade himself. There was no infringement of the privilege against self-incrimination.

At the initial pre-trial competence hearing, Mr. Gilmore, then defense counsel, offered no reason for his objection to Dr. Rollins' conducting the further examination. In objecting to the state's use of Dr. Rollins as a rebuttal witness, Mr. Middleton, trial counsel for the defense, asserted his personal opinion that the doctor was incompetent as a psychiatrist.[19]

---

16. Dr. Rollins informed the court that he had been conducting "forensic clinic evaluations" "for a couple of years", and that ordinarily such examinations were his responsibility.

17. Under Rule 26(a) of the Alaska Rules of Criminal Procedure the admissibility of evidence in criminal trials is, in general, governed by Civil Rule 43.

18. *See* State v. Obstein, 52 N.J. 516, 247 A.2d 5, 11 (1968); Shepard v. Bowe, 250 Or. 288, 442 P.2d 238, 241 (1968).

19. After extensive cross-examination of Dr. Rollins on voir dire, however, Mr. Middleton informed the court that his personal reservations about Dr. Rollins' qualifications notwithstanding, he had no objection to the doctor's testifying as an expert.

We are of the opinion that counsel's personal assessment of an expert witness' qualifications is insufficient basis for excluding that witness' testimony. The proper method for attacking an expert's qualifications is through cross-examination of the witness. In the case at bar, Mr. Middleton extensively cross-examined Dr. Rollins, both on voir dire and before the jury. That inquiry having failed to reveal any professional incompetence, appellant will not be heard on that objection before this Court. We are especially reluctant in an appellate contest and on the record before us to discredit the doctor's testimony.

Finally, with regard to Judge Davis' original order specifically excluding Dr. Rollins as a psychiatrist to conduct the further examination of Schade's competence, we fail to see how appellant was prejudiced by the occurrence of that examination. On the record before us it appears that Dr. Rollins' happening to conduct the examination was the result of inadvertance or fortuity. There is nothing in the record to indicate that the state was responsible for that examination having taken place. At any event, Judge Occhipinti refused to let Dr. Rollins testify in the April 28, 1971, pre-trial proceeding. While a defendant asserting an insanity defense is not prima facie entitled to be examined by a "friendly" psychiatrist, we are satisfied that Schade was adequately protected by Judge Occhipinti's requiring a further competence examination. There was neither prejudice in Dr. Rollins' having conducted the examination nor error in his being allowed to testify as a rebuttal witness.

Reversed and remanded for new trial.

BOOCHEVER, J., concurring separately.

RABINOWITZ, C. J., concurring in part and dissenting in part.

1. A similar warning identical in all material respects was upheld in Massimo v.

ERWIN, J., dissenting.

FITZGERALD, J., not participating.

BOOCHEVER, Justice (concurring).

Although I concur with Justice Connor's view that the *Miranda* warning given to Schade was adequate under the circumstances of this case, I find it necessary to outline my views.

Even if there were some question as to whether initiation of the interrogation of Schade at the police station rendered it "custodial" so as to necessitate the warning, it is clear that prior to the commencement of questioning Lt. Henderson had focused upon Schade as a suspect, so that Schade must be regarded as in custody for the purpose of requiring a *Miranda* warning. Nevertheless, Schade had not been placed under arrest and, as far as he knew, could depart at any time. Under these peculiar circumstances I do not believe that the addition to the warning of the statement,

We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to court.

so vitiated its effect as to render it invalid.

If, however, such a warning were to be given to one actually under arrest or placed in a position to believe that incarceration was imminent, I would find such language impermissible. Under those circumstances an uninformed accused ignorant of his right to be arraigned promptly might well believe that he must languish in jail for an indefinite period before going to court, so as to have an attorney appointed. Rather than face such a contingency he could well feel coerced into accepting interrogation without counsel.

I find no reasonable possibility that Schade could have been so misled. Since Schade was specifically advised that he had the right to have a lawyer with him during questioning, I agree that the warning as given adequately informed him of his rights.[1]

United States, 463 F.2d 1171 (2d Cir. 1972). But in United States ex rel.

RABINOWITZ, Chief Justice (concurring in part and dissenting in part).

I concur in the majority's reversal of Schade's conviction and in the majority's resolution of all issues raised in this appeal with the exception of the adequacy of the *Miranda* warning. In my view, the fatal defect contained in the warning given is found in that portion which reads, "We have no way of giving you a lawyer, but one will be appointed for you if you wish, if and when you go to court."

In Miranda v. Arizona,[1] the Supreme Court of the United States announced that in order to protect an individual's constitutional privilege against self-incrimination in a custodial-interrogation setting, certain warnings must be given. One of the warnings which the court terms "an absolute prerequisite to interrogation" and one which must be "scrupulously honored," is that an indigent who is the subject of custodial interrogation must be told that "he too has a right to have counsel present" during the interrogation, and that "if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."[2] In the event a statement is taken without the accused having the assistance of court-appointed counsel during the interrogation then

a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.[3]

In the case at bar, I am constrained to conclude that defect in the *Miranda* warning given appellant precludes the possibility of

holding that the state met this "heavy burden" of showing that Schade waived his privilege against self-incrimination.

In light of the particular wording employed by Lt. Henderson in advising Schade of his *Miranda* rights, I find the reasoning of Gilpin v. United States, 415 F.2d 638 (5th Cir. 1969), more persuasive than that of Mayzak v. United States, 402 F.2d 152 (5th Cir. 1968), which is relied upon by the majority. In *Gilpin*, the accused was given a *Miranda* warning which was, in its essential features, substantially similar to the warning given Schade. In *Gilpin*, the accused was told:

Before asking you any questions, I must explain to you that you can remain silent, that anything you say can be used against you in court, that you can talk to a lawyer first and that you have the right to the advice and presence of a lawyer even though you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if you go to court. If you want to answer questions now, you can do so but you can stop answering at any time.[4]

Judge Wisdom, writing for the *Gilpin* Court, concluded that, "[T]his language did not indicate that Gilpin had a right to have an appointed counsel *during the interrogation*. Indeed, a fair interpretation of the detective's statement is that Gilpin would be given a lawyer only if he should go to court."[5] Thus, the Court in *Gilpin* concluded that the warning there in question did not conform to the standards set by *Miranda* and was therefore defective.[6]

---

Williams v. Twomey, 467 F.2d 1248 (7th Cir. 1972), a divided court found a like warning defective. In both cases the accused had been placed under arrest prior to the questioning.

1. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966).

2. *Id.* at 471, 473, 478–479, 86 S.Ct. at 1630, 16 L.Ed.2d at 722, 723, 726.

3. *Id.* at 475, 86 S.Ct. at 1628, 16 L.Ed. 2d at 724.

4. Gilpin v. United States, 415 F.2d 638, 639 (5th Cir. 1969).

5. *Id.* at 640–641.

6. The reasoning of *Gilpin* has been paralleled in the following decisions treating *Miranda* right to counsel warning questions: *See* Lathers v. United States, 396 F.2d 524, 532–533 (5th Cir. 1968); Sullins v. United States, 389 F.2d 985, 988 n. 2 (10th Cir. 1968); Fendley v. United States, 384 F.2d 923 (5th Cir. 1967); Brooks v. State, 229 A.2d 833 (Del. 1967); Wilson v. State, 44 Ala.App. 570, 216 So.2d 741, 743 (1968).

In the case at bar, I believe that a similar conclusion is dictated. In my view, a fair reading of the warning given is that Schade would be provided with legal assistance only after he had appeared in court. This falls short of the standards set by *Miranda*. I would therefore hold Schade's confessions inadmissible.

ERWIN, Justice (dissenting).

I dissent from that portion of the majority opinion which changes the definition of the defense of insanity in criminal cases in Alaska. I do not think this case is a proper vehicle to change the law on insanity in view of the legislative action which changed the definition of insanity after the date of the trial herein.

Generally, a degree of awkwardness is inherent in any substantial change in the law. However, it is not uncommon for the high courts of the states and of the United States to make abrupt changes in the rules of common law and in constitutional interpretation.[1]

Those changes result for the pressure of social needs to keep the law in tune to newly emerging conditions of society and to the advances of knowledge and technology. While such a change conflicts with the proposition that stability of the law is important to society—a concept embodied in the doctrine of stare decisis—precedent alone is not sufficient to insure justice.[2]

We have previously considered the test for the prospective or retroactive application of a particular decision in Alaska and indicated how these competing interests are to be balanced.[3] These tests are simply not applicable to the case at bar because the change in the law concerning the defense of insanity in criminal cases resulted from legislative action rather than court decision.[4]

The problem which arises in this case results because the legislation is silent on the question of what definition of the defense of insanity is to be applied to those cases brought to trial before the effective date of the new statute on July 1, 1972,[5] even though counsel conceded that the legislature was aware of such cases and that the bill had been prepared and presented by the Public Defender Agency which represented appellant herein and appeared in all other companion cases where the insanity issue was presented.

It is my view that the court should not change the rule on insanity applicable to

---

1. *See* Fairchild, Limitation of New Judge-Made Law to Prospective Effect Only: "Prospective Overruling" or Sunbursting, 51 Marquette L.Rev. 254 (1967); Schwartz, Retroactivity, Reliability, and Due Process: A Reply to Professor Mishkin, 33 U.Chi.L.Rev. 719 (1966); Comment, Prospective Overruling and Retroactivity: Application in the Federal Courts, 71 Yale L.J. 907 (1962); Comment, Linkletter, Shott, and the Retroactivity Problem in Escobedo, 64 Mich. L.Rev. 832 (1966); Bender, The Retroactive Effect of an Overruling Constitutional Decision: Mapp v. Ohio, 110 U. Pa.L.Rev. 650 (1962); Currier, Time and Change in Judge-Made Law: Prospective Overruling, 51 Va.L.Rev. 201 (1965); Comment, The Supreme Court 1964 Term, 79 Harv.L.Rev. 56; Schaefer, The Control of "Sunbursts": Techniques of Prospective Overruling, 42 N.Y.U.L. Rev. 631 (1967).

2. See n. 1 *supra*.

3. Judd v. State, 482 P.2d 273, 279 (Alaska 1971); Gray v. State, 463 P.2d 897, 912–913 (Alaska 1970); Fresneda v. State, 458 P.2d 134, 143 (Alaska 1969); Salinas v. State, 373 P.2d 512, 516 (Alaska 1963).

4. No decision has been found which changes the test for insanity in the face of a statutory change (*see generally* 10 A.L.R.3d 1371) even though there have been jurisdictions which have indicated the matter would be left solely to the legislature. *See* State v. Gilmore, 242 Or. 463, 410 P.2d 240 (1966). Several jurisdictions have indicated that the judicial change of the test for insanity would be prospective only. State v. Conte, 157 Conn. 209, 251 A.2d 81 (1968); Dillard v. State, 274 N.E.2d 387 (Ind.1971); League v. State, 1 Md. App. 681, 232 A.2d 828 (1967).

5. AS 01.10.090 provides:
   Retrospective statutes. No statute is retrospective unless expressly declared therein.

this case by previous court decision[6] and thus make the statute retroactive.

When the legislature makes an important change, it is usually preceded by committee hearings and debates which inform the public of the possibility of change and permit people to take steps to reduce the dislocation of the transition. For this reason alone it is incumbent upon the court to give comity to the acts of the legislature whenever possible unless this results in a denial of due process of law.[7]

There is an important additional factor here. Contrary to the normal situation the change affected by a court under these circumstances has only limited application rather than general application because of the overall effect of the new statute in the future. The alternative solutions suggested to the court are narrowly defined and the assessment of the proper rule to be adopted for the great majority of cases has been seriously restricted. In effect, the court is limited to a consideration of the old standard or the new legislative standard. It, thus, may be forced to a choice of the least undesirable rule to avoid the creation of a small number of cases which are treated differently than those decided either before or after the new statute is effective even though another standard may be closer to the requirements of justice.[8]

While I have no reservation about the court exercising the power to change the law where conditions show that the rule no longer serves the cause of justice, I do not find this case the appropriate one to change the test for insanity, even though I have no general disagreement with the A.L.I. test adopted by the majority. However, if a full range of alternatives concerning the definition of insanity were available, I would have favored the adoption of those modifications of the A.L.I. tests suggested by the United States Court of Appeals for the third circuit.[9]

I would affirm the decision of the trial court.

6. Chase v. State, 369 P.2d 997 (Alaska 1962); *see also* Pope v. State, 478 P.2d 801, 805–806 (Alaska 1971), reh. den. 480 P.2d 697 (Alaska 1971).

7. *Cf.* K & L Distributors, Inc. v. Murkowski, 486 P.2d 351, 357 (Alaska 1971).

8. For a list of alternative rules of insanity, see Pope v. State, 478 P.2d 801, 806 n. 2 (Alaska 1971). It is interesting to note that in this case the appellant urged this court to adopt the Durham test as embodied in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862 (1954), rather than the A.L.I. test which is adopted.

9. United States v. Currens, 290 F.2d 751 (3rd Cir. 1961).