Cynthia LORD, Appellant,

v.

STATE of Alaska, Appellee.

No. A–10117.

Court of Appeals of Alaska.

Nov. 4, 2011.

Josie Garton, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Daniel S. Sullivan, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## *OPINION*

COATS, Chief Judge.

Cynthia Lord was charged with three counts of murder in the first degree[1] for killing her three sons, Christopher, Michael, and Joseph. Superior Court Judge Philip R. Volland conducted a non-jury trial. Lord asserted that she was not guilty by reason of insanity.[2] Judge Volland instead found that Lord was guilty but mentally ill.[3]

---

1. AS 11.41.100.

2. *See* AS 12.47.010 (stating standard for affirmative defense of insanity).

3. *See* AS 12.47.030 (stating standard for guilty but mentally ill).

Lord asserts that Judge Volland erred in reaching this verdict. She contends that she established that she was not guilty by reason of insanity by showing that she did not "appreciate the nature and quality" of her conduct. She also attacks Judge Volland's interpretation of the Alaska statutes defining the defense of insanity, and argues that those statutes are unconstitutional.

In this decision we uphold Judge Volland's verdict that Lord was guilty but mentally ill. We also uphold the constitutionality of the Alaska statutes that define the defense of insanity.

*Alaska's insanity defense*

Before 1972, Alaska applied a version of the *M'Naghten* test.[4] Under this test, a defendant could be found not guilty by reason of insanity if she either did not appreciate the nature and quality of her conduct or if she did not understand the wrongfulness of her conduct.[5] In 1972, the Alaska Legislature added the "substantial capacity test," which allowed the defense of insanity when the defendant lacked the substantial capacity to conform her conduct to the requirements of the law.[6]

In 1982, the legislature amended AS 12.47, greatly limiting the defense of insanity.[7] There are now two ways for a defendant to gain an acquittal as a result of insanity. Under AS 12.47.010(a), the defendant can establish insanity as an affirmative defense if the defendant "was unable, as a result of mental disease or defect, to appreciate the nature and quality of [her] conduct." In addition, AS 12.47.020 provides a "diminished capacity" defense. Under that statute, the defendant must be found not guilty by reason of insanity if, because of a mental disease or defect, there is a reasonable doubt that the

defendant had the culpable mental state necessary to commit the crime.[8]

The greatest change in the statutes governing the insanity defense was the creation of the verdict of "guilty but mentally ill." Under AS 12.47.030, a defendant who engages in criminal conduct is guilty but mentally ill if, because of a mental disease or defect, the defendant lacked "the substantial capacity either to appreciate the wrongfulness of that conduct or to conform that conduct to the requirements of the law." [9] Under the law as it existed prior to the 1982 amendments, a defendant would be found not guilty by reason of insanity under this standard.[10]

■ A defendant found guilty but mentally ill is not relieved of criminal responsibility. Alaska Statute 12.47.050(a) directs the court to sentence a defendant found guilty but mentally ill "as provided by law." In other words, the statute directs the sentencing judge to impose a sentence based on the normal *Chaney* sentencing criteria. The statute directs the Department of Corrections to provide mental health treatment to the defendant until the defendant "no longer suffers from a mental disease or defect that causes the defendant to be dangerous to the public peace or safety." [11] During treatment, the defendant may not be released on furlough or on parole.[12] At the successful conclusion of treatment, the defendant must serve the remainder of her sentence.[13]

This disposition for persons found guilty but mentally ill differs from the disposition for persons found not guilty by reason of insanity. Defendants found not guilty by reason of insanity may be released immediately if they prove to the court by clear and convincing evidence that they are "not pres-

4. *See Schade v. State,* 512 P.2d 907, 910–11 (Alaska 1973); *Chase v. State,* 369 P.2d 997, 1000 (Alaska 1962).

5. *Hart v. State,* 702 P.2d 651, 656 (Alaska App. 1985) (quoting Wayne R. LaFave & Austin W. Scott Jr., *Criminal Law* § 37, at 275 (1972)).

6. *Schade,* 512 P.2d at 911.

7. *Hart,* 702 P.2d at 654.

8. AS 12.47.020(b).

9. AS 12.47.030(a).

10. *See Schade,* 512 P.2d at 910–11.

11. AS 12.47.050(b).

12. AS 12.47.050(d).

13. AS 12.47.050(c).

ently suffering from any mental illness that causes [them] to be dangerous to the public."[14] Until that time, they are committed to the Commissioner of Health and Social Services for treatment for a period not to exceed the maximum term of imprisonment for the crime for which they were found not guilty by reason of insanity.[15] They are entitled to yearly hearings where they have the opportunity to establish that they are "not presently suffering from any mental illness that causes [them] to be dangerous to the public."[16] If they are still in custody at the end of the maximum term of imprisonment for the crime for which they were found not guilty by reason of insanity, the State can file a petition for civil commitment.[17]

*Factual and procedural background*

Judge Volland issued a written verdict in this case. The following facts are from that verdict:

Cynthia Lord is gravely disabled by mental illness. She suffers from schizoaffective disorder, depressive type. This disorder is characterized by delusions, hallucinations, disordered thought process and disturbed emotional experience. Ms. Lord has been in and out of psychiatric hospitals since age 17, and had been receiving mental health services in Anchorage regularly since 1994. Her condition is not likely to improve although medication may reduce her hallucinations. Since at least 2003, Ms. Lord has had delusions about a force she calls "Evil," delusions about being watched by police and the CIA, and about Satanic labels on food. Although suffering from delusions part of the time, Ms. Lord has been able to secure employment in the past, attend school at Wayland Baptist University, take care of her children, and undertake daily life care responsibilities such as shopping, cooking, housecleaning, etc.

On March 16, 2004, the Anchorage Police Department received a 911 call from Ms. Lord reporting that she had "killed my three boys." APD had had experiences with Ms. Lord before, and the police response was initially skeptical about her report. However, when officers entered her home, they found the bodies of Ms. Lord's three children: Joseph, age 16, Michael, age 18, and Christopher, age 19. Each boy had been killed by a single shot to the head.

Ms. Lord gave a voluntary statement to police that day. She told APD Detectives Mark Huelskoetter and Glen Klinkhart that she had purchased a gun in October 2003, when she made the decision to kill her sons. Ms. Lord said that on the day before [she killed her sons] she mixed some of her medication with Crystal Light so that her boys would drink it and get sleepy. She set her alarm for early in the morning and woke at approximately 2:30 a.m. It took her about an hour to work up the courage to kill Michael, her eighteen year old, during which time she drank alcohol. She first worried that the gunshot would wake the other boys or her neighbors. She then covered Michael's body with a blanket and waited for her other sons to wake up.

Ms. Lord told police that when Joseph, the youngest, woke up she told him that Michael was sick and would not be going to school. Joseph then left to attend classes at East High. When Christopher woke up around 10:00 a.m., she waited until he was playing video games in front of the entertainment center. She then shot him in the head, pulled his body into another room, and covered it with clothes so that Joseph would not see it when he came home. Christopher had asked about Michael, but Ms. Lord told him that Michael was sick as she had told Joseph. She then locked the door so "that when Joey came home ... I would be ready with the gun." When Joseph returned from school at around 2:30 p.m. and walked in the door, Ms. Lord waited until Joseph's face was turned away from her and shot him in the back of the head. She then contemplated killing her-

---

14. AS 12.47.090(c).

15. AS 12.47.090(c)–(d).

16. AS 12.47.090(e).

17. AS 47.30.700.

self for a couple of hours and eventually called the police around 4:30 p.m. Ms. Lord told detectives she expected punishment for what she did.[18]

Several psychologists testified at the trial. Judge Volland summarized their testimony:

Dr. [David] Sperbeck spent approximately eleven hours interviewing Ms. Lord, exclusive of psychological testing.

Dr. Sperbeck testified that Ms. Lord had good recall of events and described the shootings to him in greater detail than to police. He testified that Ms. Lord told him that she couldn't tell what was real or not and that she didn't want her children to grow up in a world of deception and lies. Ms. Lord told Dr. Sperbeck that she knew the boys were her children but that they acted like robots. Dr. Sperbeck testified that, despite the fact that Ms. Lord's actions were prompted by her hallucinations, she clearly knew that she was killing her children.

He testified that his opinion was that "Lord understood the nature and quality of her conduct" in that she "under[stood] the consequences of [her] act[s]." She "understood that placing a gun to the head of her children would kill them." Dr. Sperbeck was confident from Lord's repeated statements to him that she knew she was killing her boys. Judge Volland found that Dr. Lawrence Maile testified similarly to Dr. Sperbeck:

Based on Ms. Lord's systematic planning to kill her sons, her ability to identify her sons, distinguish them as human beings, and describe the consequences of her direct actions on her sons, Dr. Maile expressed the professional opinion that there [were] no impediments to Ms. Lord being found criminally responsible for the charges she faces.

Dr. Bruce Gage testified for the defense. Judge Volland summarized his testimony as follows:

Dr. Gage concluded that Ms. Lord did "understand that she was killing her boys so, to that extent, she understood the nature of her act." However, Dr. Gage was of the opinion that this did not take into account Ms. Lord's reason for killing her children, *i.e.*, to save them. Dr. Gage was of the opinion that if this motivation and context for her act is considered, Ms. Lord did not understand the nature and quality of her conduct. Dr. Gage opined that if Ms. Lord believed she was saving her children, she did not appreciate the quality of her act because she did not appreciate its true consequences.

Cynthia Lord testified at the trial. Judge Volland summarized her testimony as follows:

During her testimony, [Ms. Lord] spoke with the same flat affect that was characteristic of her interview with police, and apparently characteristic of her discussions with mental health professionals for the last decade. She described her delusions at length. Ms. Lord retold the killing of her children with the same detail she gave to police. On cross-examination, Ms. Lord admitted that she knew she was pointing a gun at Michael and that when she shot the gun it would kill him. She stated that had her daughter been in the home at the time, she would have killed her also "because she's one of the siblings." Ms. Lord testified that she knew Michael was dead after she shot him. She also admitted that after killing Joseph, she thought: "Oh my god, I killed my son." Regarding Christopher, she admitted on cross-examination that "I got the gun and I shot him in the head" and that she had told [another examining doctor] that she shot him in the back of the head because she did not want the last thing he saw to be his mother shooting him. As to Joseph, she said "I shot him." She acknowledged that when she shot her boys, she intended to pull the trigger and knew that a bullet would go into their heads and they would die. She admitted they were her boys and that they were human. She said she thought about killing herself "because she couldn't live without them."[19]

In reaching his verdict, Judge Volland first addressed whether Lord had the mens rea

18. Footnotes omitted.

19. Footnotes omitted.

for murder in the first degree. As already explained, under AS 12.47.020(b) a defendant is not guilty by reason of insanity if, "as a result of mental disease or defect, there is a reasonable doubt as to the existence of a culpable mental state that is an element of the crime."

To establish the mens rea for murder in the first degree, the State had to prove beyond a reasonable doubt that Lord intended to cause the death of Michael, Joseph, and Christopher. Alaska law states that a person acts intentionally "when the person's conscious objective is to cause that result; when intentionally causing a particular result is an element of an offense, that intent need not be the person's only objective."[20]

Judge Volland found that "the evidence is overwhelming that Ms. Lord engaged in a deliberate, conscious, and detailed plan to kill her three sons." He then set out Lord's meticulous planning that preceded the murders, and noted the opinions of the psychologists who testified at trial that Lord intended to kill her sons:

> According to Dr. Sperbeck and Dr. Maile, Ms. Lord knew her sons were her sons at the time of the shootings. Even Dr. Gage stated in his written report that Lord knew she was killing her sons. Dr. Gage also acknowledged that Ms. Lord had to have the intent to kill her sons to also have the intent to save them.

After finding that Lord had the mens rea to commit murder in the first degree, Judge Volland examined whether Lord had established the affirmative defense of insanity. Under AS 12.47.010(a), a defendant is not guilty by reason of insanity if the defendant establishes by a preponderance of the evidence that, when engaged in the criminal conduct, the defendant was "unable, as a result of mental disease or defect, to appreciate the nature and quality of that conduct."

Judge Volland first discussed *State v. Patterson*,[21] in which the Alaska Supreme Court examined the meaning of AS 12.47.010(a)—in particular, the meaning of "unable, as a result of mental disease or defect, to appreciate the nature and quality of that conduct."[22] The court observed that the legislative history of the statute contained two examples of defendants who could establish that they were unable to appreciate the nature and quality of their acts under this standard: a defendant who is "unable to realize that he is shooting someone with a gun when he pulls the trigger on what he believes to be a water pistol, or a murder defendant who believes he is attacking the ghost of [his] mother rather than a living human being."[23] According to the House Judiciary Committee report on the legislation, the defense of insanity would not apply "to a defendant who contends that he was instructed to kill by a hallucination, since the defendant would still realize the nature and quality of his act, even though he thought it might be justified by a supernatural being."[24]

Turning to the facts of this case, Judge Volland concluded:

> [T]o appreciate the nature and quality of murder means that the defendant must have understood the act that he or she engages in will cause the death of another person. Thus, for Ms. Lord to prevail on the defense of insanity under AS 12.47.010(a), she must show, by a preponderance of the evidence, that she was unable, as a result of her mental illness, to recognize that pointing a gun at the head of her sons and pulling the trigger, knowing they were her sons, would kill them.

> The court rejects Dr. Gage's reasoning that understanding the "quality" of an act requires inquiry into the context of the act and the defendant's motivation. In the court's view this invites an inquiry into wrongfulness. This is especially true in Ms. Lord's case. Ms. Lord's motivation to save her children is precisely why she did not consider the act to be wrongful. Even Dr. Gage admitted that in Ms. Lord's case,

---

20. AS 11.81.900(a)(1).

21. 740 P.2d 944 (Alaska 1987).

22. *Id.* at 946–49.

23. *Id.* at 946 n. 8.

24. *Id.*

her motivation and belief that her act was not wrong "correspond."

Judge Volland summarized why he concluded that Lord did not establish that she failed to appreciate the nature and quality of her conduct:

> There is much evidence that Ms. Lord appreciated that she was killing her children. She stated the same to Dr. Sperbeck and Dr. Maile and admitted in her own testimony that after killing Michael, she recognized that she had just shot one of her children. Ms. Lord had to work up the courage to shoot Michael. She covered her children after she shot them so she would not see them. She shot her sons in the back of the head or while they were sleeping so they would not see their mother shoot them. She shot each boy in a way that would cause instant death and the least pain. [The court finds that these actions are not consistent with a mother shooting [children] she believes are non-human clones or robots. The evidence at trial that Ms. Lord did not believe her boys were her boys was equivocal at best. The court does not find that Ms. Lord's statement to Dr. Sperbeck that "I was 80% sure I'd never see them again on this earth" evidenced that she did not believe she was killing them. Ms. Lord's admissions on cross-examination convinced the court that she knew she was killing her boys.] Because of this, the court concludes that the defense has not established by a preponderance of the evidence that Ms. Lord failed to appreciate the nature and quality of her conduct as a result of her mental disease.[25]

Judge Volland concluded, by a preponderance of the evidence, that Lord was guilty but mentally ill. He concluded that the "evidence is undisputed that Ms. Lord suffers from a severe, disabling mental illness," and that she "killed her children to save them from 'Evil' and to send them to heaven. She believed that she was doing the right thing and would do it over again; she testified to this belief at trial. The court finds her belief genuine and firmly held."

**25.** Footnote incorporated as bracketed text.

*Why we uphold Judge Volland's verdict that Lord was guilty but mentally ill*

Lord argues that Judge Volland interpreted the Alaska statutes setting out the defense of insanity too narrowly. She argues that, in arriving at his verdict, Judge Volland only applied AS 12.47.020, the diminished capacity statute, which provides that a defendant is not guilty by reason of insanity if, "as a result of mental disease or defect, there is a reasonable doubt as to the existence of a culpable mental state that is an element of the crime." Lord argues that the defense of insanity is broader, because AS 12.47.010(a) also establishes an affirmative defense of not guilty by reason of insanity if the defendant engaged in criminal conduct but "was unable, as a result of mental disease or defect, to appreciate the nature and quality of that conduct."

In rejecting Lord's insanity defense, Judge Volland found that, even though the "evidence [was] undisputed that Ms. Lord suffers from a severe, disabling mental illness," Lord formed the culpable mental state to commit murder in the first degree. He found that "the evidence is overwhelming that Ms. Lord engaged in a deliberate, conscious, and detailed plan to kill her three sons."

█ Lord agrees that this finding was sufficient for Judge Volland to reject a "diminished capacity" defense under AS 12.47.020. But she asserts that Judge Volland erred by using these same findings to reject her affirmative defense of not guilty by reason of insanity under AS 12.47.010. Lord argues that if the legislature intended to restrict the insanity defense to only an inquiry about whether a defendant could form the mens rea to commit the crime, then AS 12.47.010 would be superfluous. She argues that the legislative history of the statutes governing the insanity defense show no intent to limit the defense in this way.

Lord argues that, applying the proper test in AS 12.47.010(a), the evidence at trial established the affirmative defense of insanity because it showed that she had no understanding of the meaning of death, and there-

fore did not appreciate the nature and quality of her acts. But Judge Volland rejected the factual basis for this argument. He found that Lord knew she was killing her boys and appreciated the nature of death based on her testimony that she "was 80% sure I would never see them again on this earth."

In explaining his verdict, Judge Volland carefully considered the testimony of the psychologists as well as the evidence of Lord's hallucinations and delusions. He concluded that, in spite of these mental defects, Lord understood the nature and quality of her acts. He set out her meticulous reasoning and the steps she took as she planned and carried out the killing of her sons. He concluded that she understood what she was doing and understood the concept of death— she knew with substantial certainty that, by killing her sons, she was removing them from this earth and that she would never see them alive again. We conclude that there is no merit to Lord's claim that Judge Volland failed to make the findings necessary to reject her affirmative defense of insanity.

■ To find that Lord was guilty but mentally ill, Judge Volland had to find that she lacked "the substantial capacity either to appreciate the wrongfulness of [her] conduct or to conform that conduct to the requirements of the law."[26] Judge Volland concluded that, because of her mental illness, Lord sincerely believed she was doing the right thing by killing her sons "to save them from 'Evil' and send them to heaven." He found that, because of her mental disease or defect, she lacked the substantial capacity to appreciate the wrongfulness of her conduct. Judge Volland's findings are supported by the record,

and they support his verdict that Lord was guilty but mentally ill.

*Why we reject Lord's constitutional attacks*

Lord's initial constitutional attack is based on her argument that Judge Volland misinterpreted AS 12.47.010 to provide a defense of not guilty by reason of insanity than is no broader than the "diminished capacity" defense in AS 12.47.020. She argues that the judge's narrow interpretation, in conjunction with the more severe sentencing provisions that follow a verdict of guilty but mentally ill, violated her federal and state guarantees to due process and to be free from cruel and unusual punishment. But as already explained, Judge Volland carefully considered whether Lord appreciated the nature and quality of her conduct as required by AS 12.47.010(a), and concluded that she did. We have upheld those findings.

Lord raises a more fundamental attack on the statutes setting out the defense of not guilty by reason of insanity. Lord argues that the statutes violate both the United States and Alaska constitutions by imposing criminal responsibility in cases in which the defendant does not have the capacity to appreciate the wrongfulness of her conduct.

■ If the State proves beyond a reasonable doubt that the defendant possessed the mens rea required by a criminal statute, the United States Constitution does not require any further inquiry into the defendant's mental state to support a conviction.[27] Lord argues that we should interpret the Alaska Constitution more broadly than the Supreme Court has interpreted the federal constitu-

---

26. AS 12.47.030(a).

27. *See, e.g., Powell v. Texas,* 392 U.S. 514, 535–36, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (refusing to define an insanity defense in constitutional terms and stating that "The doctrines of actus reus, mens rea, insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man. This process of adjustment has always been thought to be the province of the States."); *see also Clark*

*v. Arizona,* 548 U.S. 735, 752–53, 126 S.Ct. 2709, 165 L.Ed.2d 842 (2006); *Walker v. Endell,* 850 F.2d 470, 473 (9th Cir.1987) (rejecting the argument that the Due Process Clause of the United States Constitution requires that "criminal intent" be an element of kidnapping and robbery); *Davis v. McCotter,* 766 F.2d 203, 204 (5th Cir. 1985) (rejecting the argument that "voluntariness" is a constitutionally required element of robbery); *United States v. Mitchell,* 725 F.2d 832, 835 (2d Cir.1983) (refusing to "constitutionaliz[e] a particular formula for disproving the defense of duress").

tion.[28] But we have previously rejected constitutional attacks on the Alaska statutes that set out the defense of not guilty by reason of insanity. In *Hart v. State*,[29] the defendant argued that holding a person who lacked the capacity to conform her conduct to the requirements of the law criminally responsible for that conduct violated the due process, cruel and unusual punishment, and equal protection clauses of the United States and Alaska constitutions.[30] In rejecting those constitutional challenges, we observed that the Alaska statutes required the State "to prove beyond a reasonable doubt that the defendant engaged in conscious voluntary acts … and possessed the requisite mens rea for the offense." [31] We ultimately concluded that "the State may constitutionally eliminate a separate insanity defense based on 'irresistible impulse' or inability to conform one's conduct to the requirements of the law." [32] We stated that the "determination of the point at which a person's mental condition justifies exculpation is … an ethical question for legislators and juries, not courts." [33] We also upheld the statutes establishing the verdict of guilty but mentally ill against constitutional attack in *Barrett v. State*.[34] We adhere to those decisions.

*Judge Volland required the State to prove beyond a reasonable doubt that Lord possessed the mens rea for first-degree murder*

Lord argues that Judge Volland impermissibly shifted the burden of proving the mens rea of first-degree murder—*i.e.*, the intent to cause death—on to her. But the record clearly shows that in reaching his verdict, Judge Volland carefully examined the evidence and concluded that the State had proved beyond a reasonable doubt that Lord intended to cause the death of Michael, Joseph, and Christopher Lord. The record is therefore clear that Judge Volland correctly applied the standard of proof.

*Conclusion*

The judgment of the superior court is AFFIRMED.

**28.** *Myers v. Alaska Psychiatric Institute*, 138 P.3d 238, 245 (Alaska 2006) (citing *Anchorage Police Dep't Employees Ass'n v. Anchorage*, 24 P.3d 547, 550 (Alaska 2001) & *Breese v. Smith*, 501 P.2d 159, 170 (Alaska 1972)) (recognizing that the Alaska Constitution's guarantees of privacy and individual liberty are "broader in scope" than those in the federal constitution).

**29.** 702 P.2d 651 (Alaska App.1985).

**30.** *Id.* at 653.

**31.** *Id.* at 655–56 (footnotes omitted).

**32.** *Id.* at 659 (footnote omitted).

**33.** *Id.* (citations omitted); *see generally* Wayne R. LaFave, *Substantive Criminal Law*, § 7.1(d) at 521–23 (2d ed. 2003) (collecting arguments in favor of and opposed to abolishing the insanity defense).

**34.** 772 P.2d 559, 573 (Alaska App.1989).