NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| RACHELLE A. WATERMAN, | Court of Appeals No. A-11052 |
| Appellant, | Trial Court No. 1KE-04-1312 CR |
| v. | |
| STATE OF ALASKA, | O P I N I O N |
| Appellee. | No. 2441 — February 6, 2015 |

Appeal from the Superior Court, First Judicial District, Ketchikan, William B. Carey, Judge.

Appearances: Dan S. Bair, Assistant Public Advocate, Appeals and Statewide Defense Section, and Richard Allen, Public Advocate, Anchorage, for the Appellant. Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Hanley, District Court Judge.[*]

Judge MANNHEIMER.

---

[*] Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

When a defendant is charged with criminally negligent homicide under AS 11.41.130, one of the elements the State must prove is that the defendant failed to perceive a risk of human death that was substantial and unjustifiable — "of such a nature and degree that the failure to perceive it constitute[d] a gross deviation from the standard of care that a reasonable person would observe in the situation." *See* AS 11.81.-900(a)(4), the statutory definition of "criminal negligence".

The question presented in this appeal is whether "the standard of care that a reasonable person would observe in the situation" should vary according to the age of the defendant — more specifically, whether a different standard of care should apply in cases where the defendant is a teenager or young adult under the age of 25, before the prefrontal cortex of the brain is fully developed.

The defendant in this case argues that when a juvenile or young adult is charged with criminally negligent homicide (or any other crime involving proof of criminal negligence), the "reasonable person" standard of care specified in the statute should not be evaluated against the conduct we would expect of a mature adult, but rather the conduct we would expect of a teenager or young adult of "similar age, intelligence, and experience".

In the absence of legislation, this might be a question for the judicial branch to answer. But the legislature has spoken on this issue. Even though current scientific research indicates that the development of the prefrontal cortex is not complete in most people until they reach their mid-twenties, it is the law of Alaska (and every other American jurisdiction) that all persons who have reached the age of 18 years are governed by the normal criminal law — its definitions of criminal offenses, and its specified penalties. And the Alaska legislature (like the legislatures of many other states) has amended our juvenile delinquency laws so that, with regard to the most serious

felonies, the normal criminal law applies to persons as young as 16 years. *See* AS 47.12.030.

One could argue that, given recent scientific research into brain development, the threshold age of adult criminal responsibility should be altered, or different standards of culpability should apply to persons younger than 25. But the assessment of the proper scope of criminal responsibility hinges on more than brain science. Even among fully mature adults, there is considerable variation in perception, physical ability, intellect, and self-control.

Because of this, the problem of defining the nature and extent of criminal responsibility involves larger issues of philosophy, morality, and social policy. And under our government of divided powers, it is the legislative branch that is primarily responsible for addressing and resolving these issues.

It is true that there are constitutional limits on the legislature's authority to define the scope of criminal responsibility and the range of punishments that may be imposed for violations of the criminal law. But we conclude that it is constitutional for the legislature to specify a single standard of care for criminally negligent homicide, even when the defendant is a young adult under the age of 25, or even a teenager as young as 16. We therefore affirm Waterman's conviction.

*Underlying facts*

In November 2004, Rachelle Waterman's mother was murdered by two young men — Brian Radel and Jason Arrant. Waterman had recently dated both of these men. According to the State's evidence, the two young men began plotting to kill Waterman's mother because Waterman told them that she was suffering physical and emotional abuse at the hand of her mother.

Specifically, Waterman reported that her mother had beaten her, thrown her down the stairs, threatened her with a knife, and threatened to sell her into slavery. Waterman openly suggested that she wanted her mother dead.

In response, the young men decided that one of them (Brian Radel) would ambush Waterman's mother with a shotgun. When the other young man (Jason Arrant) told Waterman about this plan, Waterman asked Arrant not to go through with it. But Arrant never communicated this information to Radel, so Radel proceeded to the ambush spot.

The ambush never took place — because, when Radel arrived at the spot, he realized that he had forgotten to bring the bolt that connected the shotgun's barrel to its stock.

Arrant informed Waterman about this unsuccessful murder attempt: he wrote her an e-mail in which he referred to it as a "hunting trip". Waterman did not warn her mother, nor did she alert the police. Rather, Waterman sent a letter to Arrant in which she said that she was tempted to take a "hunting trip" herself.

Several weeks later, after Waterman again reported that her mother had beaten her, the two young men decided to try again. This time, the plan was to make it look as if Waterman's mother was killed in a traffic accident.

The two men waited until a weekend in November when both Waterman and her father were out of town. Then they broke into the Waterman residence, kidnapped Waterman's mother, drove her out of town in the family van, beat her to death, placed her body in the van, let the van go over the edge of the road, and set the van on fire with gasoline.

The State indicted Waterman for first-degree murder, conspiracy to commit murder, second-degree murder (under the felony-murder provision of the statute), and kidnapping — all on the theory that Waterman was complicit in Radel's and Arrant's

crimes. Even though Waterman was 16 years old at the time of the homicide, she was charged as an adult under the provisions of AS 47.12.030(a).

As an alternative to the murder and conspiracy charges, the State also charged Waterman with criminally negligent homicide — under the theory that even if Waterman did not actively plot her mother's death, she nevertheless placed her mother in a situation of peril by her actions, and she was therefore guilty of criminally negligent homicide because she failed to take reasonable steps to warn her mother, or to alert the authorities, that Radel and Arrant were plotting to kill her mother.

As a defense to the State's primary charges (murder and conspiracy to commit murder), Waterman contended that she was not serious when she spoke of wanting her mother dead, and that she did not think that Radel and Arrant would really go so far as to kill her mother.

As a defense to the lesser charge of criminally negligent homicide, Waterman presented expert testimony on adolescent brain development. According to this testimony, the prefrontal cortex — the portion of the human brain responsible for planning, the ability to think in the long-term, and the ability to control impulsive behavior and risk-taking — does not become fully developed until a person is around 25 years old. Thus, even though adolescents and young adults are just as capable as more mature adults when it comes to perceiving or understanding the risks that accompany certain behavior, they have a lesser ability to "appreciate" these risks — *i.e.*, a lesser ability to weigh those risks, assess the likely consequences, and stop themselves from engaging in the risky behavior.

In conjunction with this expert testimony, Waterman's attorney asked the trial judge to modify the jury instruction defining the standard of care that the jurors should use when evaluating Waterman's conduct.

Instead of the standard defined in the culpable negligence statute, AS 11.81.900(a)(4) — a gross deviation from the standard of care that "a reasonable person" would observe in the situation — Waterman's attorney asked the judge to tell the jurors that they should decide whether Waterman's conduct constituted a gross deviation from the standard of care to be expected of "a person of similar age, intelligence, and experience".

The trial judge declined to give this instruction because he concluded that, even with respect to defendants as young as Waterman, the legislature wanted a defendant's conduct to be evaluated against the normal adult standard of criminal negligence — and that the legislature was not constitutionally required to adopt a different standard.

At the conclusion of the trial, the jury found Waterman not guilty of the most serious charges against her (conspiracy to commit murder, first-degree murder, second-degree murder, and kidnapping). That is, the jury concluded that the State failed to prove that Waterman was complicit in the murder and kidnapping plot.

However, the jury found Waterman guilty of the lesser offense of criminally negligent homicide. That is, the jury found (1) that there was a substantial and unjustifiable risk that Radel and Arrant would kill Waterman's mother, (2) that Waterman failed to perceive this risk, and (3) that Waterman's failure to perceive this risk constituted a "gross deviation from the standard of care that a reasonable person would observe in the situation." *See* AS 11.81.900(a)(4) (the definition of criminal negligence).

(We note that Waterman's jury was not expressly asked to decide the remaining essential component of criminal liability for negligence: that Waterman was under a duty to take action to protect her mother. Normally, the law does not require a person to take affirmative action to prevent a crime or to protect other people from

harm. [1]  There can be a duty to act, however, if the person's own actions have placed another person in peril. [2]  This was apparently the State's theory in Waterman's case: that Waterman, by complaining about her mother's abusive behavior and by expressing the desire to see her mother dead, had caused Radel and Arrant to begin actively plotting her mother's murder; and that the danger to Waterman's mother was reasonably foreseeable to Waterman, since Arrant told Waterman about the failed ambush with the shotgun.  This issue is not raised on appeal, so we will address it no further.)

> *Waterman's argument that, under Alaska statutory law, when a juvenile is charged with an offense based on criminal negligence, the applicable standard of care is what we should expect from a juvenile of "similar age, intelligence, and experience"*

In the jury instruction defining criminal negligence, Waterman's jury was told that they had to decide whether Waterman failed to perceive "a substantial and unjustifiable risk" that her mother would be murdered by the two young men, and whether Waterman's failure to perceive this risk "constitute[d] a gross deviation from the standard of care that a reasonable person would observe in the situation."

As we have explained, Waterman asked the superior court to instruct the jurors that they should gauge her conduct — more precisely, her failure to perceive the risk to her mother's life — against the standard of care that should be expected of a reasonable teenager "of similar age, intelligence, and experience", rather than what should be expected of an adult.

---

[1]  *See* Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd edition 1982), pp. 659-662; Wayne R. LaFave, *Substantive Criminal Law* (2nd edition 2003), § 6.2(a), Vol. 1, pp. 436-443.

[2]  *Perkins & Boyce*, p. 666; *LaFave*, § 6.2(a)(5), Vol. 1, pp. 441-42.

On appeal, Waterman renews her contention that teenagers should be held to a different, more lenient standard of negligence. She advances two main arguments in support of this proposition.

First, Waterman relies on this Court's decision in *J.R. v. State*, 62 P.3d 114 (Alaska App. 2003). *J.R.* was the appeal of a minor who was prosecuted under the juvenile delinquency laws for second-degree murder under the theory that he acted with "extreme indifference to the value of human life" when he urged a friend to commit murder, and instructed the friend on how to use a shotgun. [3] This Court held that when the jury assessed whether J.R. acted with extreme indifference to the value of life, the jury should have been told to evaluate J.R.'s conduct "against the standard of a reasonable person of his age, intelligence, and experience", rather than against an adult standard. 62 P.3d at 119.

Second, Waterman relies on the scientific research that she presented at her trial — research showing that the prefrontal cortex of the human brain does not fully develop until a person reaches their mid-twenties. According to this research, people in their teens and early twenties may not have the same degree of judgement, impulse control, and appreciation of consequences as more mature adults.

We address each of these arguments in turn.

*Our decision in J.R. v. State does not apply to cases where juveniles are prosecuted as adults under the provisions of AS 47.12.030(a)*

In *J.R. v. State*, this Court addressed the question of whether a normal adult standard of care should apply when a teenager is prosecuted under the delinquency provisions of AS 47.12 for an offense involving recklessness. (As we have explained,

_____

[3]  *J.R.*, 62 P.3d at 114.

the defendant in *J.R.* was charged with second-degree murder under the theory that he acted with extreme or heightened recklessness — described by the statute as "extreme indifference to the value of human life".)

We held that, given the circumstances of J.R.'s case, the jury should have been instructed to apply a lesser standard of care: that J.R.'s degree of recklessness should have been evaluated "against the standard of a reasonable person of his age, intelligence, and experience", rather than against an adult standard. 62 P.3d at 119.

Our decision in *J.R.* was in line with the mainstream view in juvenile delinquency and tort cases. As we noted in *J.R.*, courts from other states have likewise concluded that, in juvenile delinquency proceedings, a minor's degree of recklessness should normally be assessed against the degree of care reasonably expected of minors, not the degree of care reasonably expected of adults. *Id.* at 117-18.

But Waterman was not prosecuted as a delinquent minor. She was prosecuted as an adult, because the Alaska legislature has expressly declared that when a person is charged with murder (or one of several other serious felonies), adult criminal responsibility begins at age 16 rather than age 18. *See* AS 47.12.030(a).

Waterman does not challenge the legislature's authority to fix the age at which adult criminal responsibility begins. [4] She concedes that she was properly prosecuted for criminally negligent homicide as an adult. She argues, however, that even though she was properly prosecuted for criminally negligent homicide as an adult, the jury should have been instructed to apply a special definition of this offense. More

---

[4] On this issue, see this Court's decision in *Nao v. State*, 953 P.2d 522, 524-26 (Alaska App. 1998). See also the recent decision of the Illinois Court of Appeals in *People v. Harmon*, __ N.E.2d __, 2013 WL 5783384 at *10-15 (Ill. App. 2013) (discussing this issue in the context of United States Supreme Court decisions acknowledging the recent scientific research into adolescent brain development).

specifically, Waterman argues that our decision in *J.R.* required the superior court to apply a special definition of criminal negligence because of Waterman's youth.

There is surprisingly little authority on the question of whether different culpable mental states should apply when a young person is prosecuted as an adult. The only published decision we (or the parties) could find is the decision of the Arizona Court of Appeals in *State v. Oaks*, 104 P.3d 163, 165-67 (Ariz. App. 2004). However, we believe that the general approach taken by the Arizona court is correct.

The decision in *Oaks* rests on two underlying principles: the principle that the legislature has the authority to determine the scope of adult criminal responsibility, and the principle that the legislature has the authority to define crimes. *Oaks*, 104 P.3d at 165. Based on these principles, the Arizona court concluded that the issue presented — identifying which standard of care should apply when a teenager is prosecuted for a serious felony as an adult — was ultimately a question of legislative intent. *Ibid*.

The Arizona court then concluded, based on the pertinent legislative history, that when Arizona law declared that juveniles older than a certain age "shall be prosecuted as adults" for murder and other violent felonies, this meant that juvenile defendants were to be held to a normal adult standard of care when a jury assessed the defendant's recklessness. *Id.* at 166.

Our statute, AS 47.12.030(a), is worded in a similar fashion: it declares that when a person 16 years of age or older is indicted for murder, the delinquency laws do not apply, and that person "shall be charged, ... prosecuted, [and] sentenced ... in the same manner as an adult."

The legislative history of this statute and its predecessor, former AS 47.-10.010(e), show that the legislature was concerned by the number of violent crimes committed by juveniles and the apparent failure of the existing juvenile delinquency

procedures "to provide the convincing threat of punishment necessary to deter juvenile [offenders] from evolving into hardened criminals". [5]

Based on these concerns, our legislature has, over the past twenty years, gradually narrowed the coverage of the juvenile delinquency laws and increased the scope of adult criminal prosecution for felonies involving violence — including felonies that hinge on proof of the defendant's recklessness, such as first-degree assault [6] and first-degree sexual assault. [7]

In her brief to this Court, Waterman notes that this legislative history does not contain any explicit discussion of whether, when a juvenile is prosecuted as an adult, the fact-finder should apply a normal adult standard of care or, instead, a less demanding juvenile standard of care when assessing the defendant's recklessness or negligence. Waterman argues that the legislature's silence on this issue should be interpreted as meaning that the legislature acquiesced in the rule that this Court adopted for delinquency proceedings in *J.R.*.

But we believe this argument is flawed because it ignores a fundamental difference between the goals of the adult criminal justice system and the goals of the juvenile justice system.

As this Court noted in *State v. Morgan*, 111 P.3d 360 (Alaska App. 2005), "[t]he juvenile justice system is premised on a *parens patriae* theory — the concept that the State takes a benevolent attitude toward more youthful offenders because, generally,

___

[5] *See* the "Sponsor Memorandum" dated February 2, 1993 for Senate Bill 54 (18th Legislature) by Senator Rick Halford, and the undated "Letter of Intent" by House Judiciary Chairman Brian Porter.

[6] AS 11.41.200(a)(1).

[7] AS 11.41.410(a)(1); *see Reynolds v. State*, 664 P.2d 621, 623-25 (Alaska App. 1983) (holding that a charge of first-degree sexual assault requires proof that the defendant acted recklessly with regard to the victim's lack of consent).

a person under eighteen years of age does not have mature judgment and may not fully realize the consequences of their acts." Thus, "[t]he actions taken against a minor under the juvenile justice system are geared toward individual treatment and reformation". 111 P.3d at 365. The criminal justice system, on the other hand, is geared toward different goals — in particular, the goals of general deterrence and community condemnation. *Ibid*.

By enacting AS 47.12.030(a), the legislature removed a group of 16- and 17-year-old felony offenders from the "benevolent", individually focused treatment of the juvenile justice system, and made them subject to the more societally oriented prosecution and punishment of the adult criminal justice system.

In the juvenile justice system, where rehabilitation and special deterrence (*i.e.*, individual deterrence) are paramount goals, it makes little sense to impose sanctions on youthful defendants for failing to perceive and react to risks that we could not expect them to perceive in the first place.

But in the criminal justice system, the punishment of people for negligent acts — that is, punishment for a failure to perceive a danger — is based primarily on notions of community condemnation and general deterrence. Negligence differs from recklessness in that the actor is not punished for having a blameworthy state of mind (*i.e.*, awareness and conscious disregard of a known risk). Rather, the actor is punished for failing to perceive the risk, and thus failing to live up to *societal expectations* in situations where the actor has a duty to take preventative or corrective action.

In fact, one classic text on the criminal law, Perkins & Boyce's *Criminal Law*, takes the position that it is better to think of "negligence", not as a state of mind, but rather as *conduct*: "any conduct ... which falls below the standard established by law for the protection of others against unreasonable risk of harm", in cases where the

defendant has not acted with a blameworthy culpable mental state (*i.e.*, acted intentionally, wantonly, or with conscious disregard for the rights or interests of others). [8]

Thus, the criminal justice standard for negligence is an objective one, based on the perceptions and conduct we would expect of a reasonable person.

When the threshold age of criminal responsibility was uniformly 18 years (*i.e.*, before the legislature lowered the age of criminal responsibility to 16 years for certain serious felonies), the law of negligence made no allowance for defendants whose youthful age, or whose limited intelligence or experience, rendered them less capable of living up to society's expected standards. All people older than 18 had to live up to the standard of care that one would expect a reasonable person to observe. We conclude that this principle remains unchanged, even though the age of adult criminal responsibility is now 16 years for the serious felonies specified in AS 47.12.030(a).

For these reasons, we reject Waterman's argument that our holding in *J.R.* governs the prosecution of youthful offenders for crimes of negligence in the adult criminal justice system.

*Why we conclude that recent advances in scientific understanding of human brain development do not require a different result*

As we explained earlier in this opinion, Waterman presented expert testimony at her trial on the subject of human brain development. According to this expert testimony, the prefrontal cortex — the portion of the human brain responsible for planning, the ability to think in the long-term, and the ability to control impulsive behavior and risk-taking — generally does not become fully developed until a person is around 25 years old. Thus, even though adolescents and young adults are just as capable

---

[8]    Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* (3rd edition 1982), p. 841.

as more mature adults when it comes to perceiving or understanding the risks that accompany certain behavior, they have a lesser ability to "appreciate" these risks — *i.e.*, a lesser ability to weigh those risks, assess the likely consequences, and stop themselves from engaging in risky behavior.

(This research has already been discussed in several judicial opinions from around the country, including opinions of the United States Supreme Court.[9] We ourselves summarized this research in *Smith v. State*, 258 P.3d 913, 919-920 (Alaska App. 2011).)

Based on this research into the development of the human brain, Waterman argues that it is inconsistent with "all notions of a fair trial" — in other words, a denial of due process — to preclude jurors from considering this information when a jury decides whether a teenager or young adult acted with criminal negligence.

As we have explained, Waterman's attorney openly argued during his summation (without objection) that the jurors should consider this information about human brain development when they decided whether Waterman acted with criminal negligence in causing her mother's death.

But criminal negligence is different from the extreme indifference to the value of human life required for second-degree murder or the recklessness required for manslaughter — because, unlike the definitions of extreme indifference and recklessness, the definition of criminal negligence has no subjective component. Compare AS 11.81.900(a)(3) with AS 11.81.900(a)(4). The jurors found that Waterman acted with criminal negligence precisely because she did *not* appreciate the substantial and unjustifiable danger to her mother's life.

---

[9] *See Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), and *Graham v. Florida*, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010).

The issue in Waterman's case arises from the fact that, given our statutory definition of criminal negligence (*i.e.*, a definition that does not require the State to prove a defendant's awareness of the risk), the delayed development of the prefrontal cortex is not particularly relevant to the jury's assessment of this negligence. Waterman is really arguing that, in light of our current understanding of human brain development, it is unconstitutional for the Alaska legislature (or any legislature) to define criminal negligence in such a way that young people under the age of 25 are held to the same standard of care as adults who are 25 years of age or older.

As we have already explained, the criminal law has traditionally defined negligence in such a way that individual variations in age, intellect, and life experience are not relevant to the question of whether a defendant acted with criminal negligence. We therefore begin with the presumption that this traditional objective definition of negligence is constitutional.

Conceivably, the matter is different when the variations in age, intellect, and life experience are not confined to individuals, but rather are found in entire groups of society — such as all people who have not yet reached their mid-twenties.

But it is important to note that scientists do not claim that *all* people younger than 25 have a reduced capacity to appreciate risks and control themselves. The research has given us only generalized descriptions of human brain development, not reliable predictions about any particular individual's mental abilities.

This fact was recognized by both the majority and the dissenters in the United States Supreme Court's decision in *Roper v. Simmons*. Here is the discussion of this point in the lead opinion:

> The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach.

*Roper*, 543 U.S. at 574, 125 S.Ct. at 1197.  And here is the corresponding discussion in Justice O'Connor's dissent:

> [A]t the margins between adolescence and adulthood ... the relevant differences between "adults" and "juveniles" appear to be a matter of degree, rather than of kind.
>
> .  .  .
>
> Chronological age is not an unfailing measure of psychological development, and common experience suggests that many 17-year-olds are more mature than the average young "adult."

*Roper*, 543 U.S. at 600-01, 125 S.Ct. at 1213-14.

Moreover, even though scientific research now shows that young people under the age of 25 typically do not have the same mental faculties as more mature adults, this does not directly answer the question of whether these young people should be held to the same standard of care as more mature adults when, in a criminal case, a jury must decide whether they acted negligently.

Our criminal law has many aims (see the goals listed in AS 12.55.005), and the law's definitions of crimes and defenses often represent a balancing of competing interests.

For instance, it is widely understood that many crimes are the product of intoxication — in the sense that these offenses are committed by people who would not engage in such acts if they were sober.  But for reasons of social policy, our law generally does not allow defendants to argue that they should be held blameless because they were intoxicated.

Indeed, in Alaska's current criminal code, the legislature has expressly declared that voluntary intoxication is no defense to an allegation that a defendant acted

"knowingly" or "recklessly" with respect to a circumstance or a risk. *See* AS 11.81.-900(a)(2) and (a)(3). And this Court has expressly upheld the constitutionality of these statutes.

(See *Neitzel v. State*, 655 P.2d 325, 330-31 (Alaska App. 1982), where we upheld the legislature's decision to define "knowingly" in a manner that precludes any potential assertion of lack of knowledge due to voluntary intoxication, and *Abruska v. State*, 705 P.2d 1261, 1264-66 (Alaska App. 1985), where we upheld the legislature's decision to define "recklessly" in a manner that precludes any potential assertion that the defendant lacked awareness of the risk due to voluntary intoxication.)

More generally, the legislature is empowered to define criminal offenses in ways that relieve the government from proving certain factors, or that eliminate potential defenses, or that place the burden of proving exculpating circumstances on the defendant. We discussed this area of the law in *Steve v. State*, 875 P.2d 110, 118-19 (Alaska App. 1994), a case in which we held that it was constitutional for the Alaska legislature to define sexual abuse of a minor ("statutory rape") in a manner that placed the burden on the defendant of proving that they acted under a reasonable mistake as to the victim's age.

In *Steve*, we explained that when a factor raised by the defense does not negate an element of the crime, but instead provides a mitigation, justification, or excuse for the crime,

> [the] burden of proof [on this factor] is not constitutionally compelled but can be selected on policy grounds. *See Martin v. Ohio*, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987) (the defendant can be made to prove self-defense by a preponderance of the evidence); *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (the defendant can be made to prove heat of passion by a preponderance of the evidence); *Leland v. Oregon*, 343 U.S.

790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (the defendant can be made to prove insanity beyond a reasonable doubt).

*Steve*, 875 P.2d at 119.

And as this Court has observed, the United States Supreme Court "has repeatedly held that legislatures have considerable latitude in defining what facts are necessary to constitute [a] crime." [10] For instance, this Court held in *Lord v. State*, 262 P.3d 855, 861-62 (Alaska App. 2011), that it was constitutionally permissible for the Alaska legislature to define murder in such a way that a defendant's mental capacity to appreciate the wrongfulness of their conduct was not an element of the crime. Similarly, in *Hart v. State*, 702 P.2d 651, 655-59 (Alaska App. 1985), we held that it was constitutionally permissible for the legislature to declare that a defendant's ability to conform their conduct to the requirements of law is not an element of any crime.

The underlying basis of this principle is explained in *Powell v. Texas*:

> The doctrines of *actus reus*, *mens rea*, insanity, mistake, justification, and duress have historically provided the tools for a constantly shifting adjustment of the tension between the evolving aims of the criminal law and changing religious, moral, philosophical, and medical views of the nature of man[.]

392 U.S. 514, 536; 88 S.Ct. 2145, 2156; 20 L.Ed.2d 1254 (1968) (plurality opinion).

*See also Walker v. Endell*, 850 F.2d 470, 473 (9th Cir. 1987); *United States v. Lyons*, 731 F.2d 243, 246 (5th Cir. 1984) (*en banc*) ("[W]hat definition of 'mental disease or defect' is to be employed by courts enforcing the criminal law is, in the final

---

[10] *Lawson v. State*, 264 P.3d 590, 596 (Alaska App. 2011), citing *Schad v. Arizona*, 501 U.S. 624, 638; 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion), and *Patterson v. New York*, 432 U.S. 197, 210-11; 97 S.Ct. 2319; 53 L.Ed.2d 281 (1977).

analysis, a question of legal, moral and policy — not of medical — judgment.”); *United States v. Mitchell*, 725 F.2d 832, 835 (2nd Cir. 1983).

Returning to the question of criminal negligence, Alaska's criminal law has traditionally required all people 18 years or older to adhere to an adult standard of care. When the legislature enacted AS 47.12.030(a), that threshold age was lowered to 16 years in certain circumstances. Now, scientific research suggests that there might be good reason to raise that threshold age to as high as 25 years. But that change would have significant consequences for the operation of the criminal law as a societal tool. Under our system of government, such matters are entrusted to the legislature, and the constitution does not require a particular result.

This is not to say that a defendant's youth is irrelevant to their degree of blameworthiness, or to their prospects for rehabilitation as they grow older. Sentencing judges can properly take this factor into account when deciding what sentence a youthful offender should receive, and the Parole Board can likewise consider this factor when deciding whether to grant discretionary parole to an offender whose crime was committed when they were young.

But the question in Waterman's case is whether the constitution forbids the legislature from defining the concept of criminal negligence as a uniform standard that applies to older teenagers and young adults, even though we know that full mental development generally does not occur until a person's mid-twenties.

As the United States Supreme Court acknowledged in *Roper v. Simmons*, any legislative attempt to define the threshold of criminal responsibility based on age "is subject ... to the objections always raised against categorical rules." [11] But these rules are a traditional aspect of our law. And there are strong policy reasons for drawing the line in this fashion — rather than requiring courts and juries to engage in case-by-case

---

[11] 543 U.S. at 574, 125 S.Ct. at 1197.

litigation of whether a particular defendant has reached a stage of mental development where society should subject them to the normal rules of criminal responsibility.

We therefore hold that Alaska's uniform definition of criminal negligence is constitutional.

*Conclusion*

For the reasons explained in this opinion, we conclude that Waterman was properly held to an adult standard of care when the jury assessed whether she acted with criminal negligence in causing the death of her mother. The judgement of the superior court is AFFIRMED.